# IN THE SUPREME COURT OF IOWA

No. 16–1078

Filed June 1, 2018

Amended June 4, 2018

**VALERIE BANDSTRA, ANNE BANDSTRA, RYAN BANDSTRA,** and **JASON BANDSTRA,**

Appellants,

vs.

**COVENANT REFORMED CHURCH,**

Appellee.

---

Appeal from the Iowa District Court for Marion County, John D. Lloyd, Judge.

Appellants appeal several summary judgment and discovery rulings in their civil suit against a religious entity. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, for appellants.

Michael W. Thrall of Nyemaster Goode, P.C., Des Moines, and Frances M. Haas of Nyemaster Goode, P.C., Cedar Rapids, for appellee.

Eugene Volokh of Scott & Cyan Banister First Amendment Clinic at UCLA School of Law, Los Angeles, California, and Jason D. Walke of Walke Law, LLC, Waukee, for amicus curiae International Society for Krishna Consciousness, Inc.

**CADY, Chief Justice.**

In this appeal, we address a number of claims within a lawsuit by two female parishioners and their spouses against a church based on claims of negligence and defamation involving sexual abuse and exploitation perpetrated on the women by the church pastor and the subsequent response by the governing body of the church. The district court granted summary judgment for the church on all claims except negligent supervision, but found the negligent-supervision claims brought by the female parishioners were barred by the statute of limitations. On appeal, we affirm the district court in part and reverse in part. We hold the Religion Clauses of our State and Federal Constitutions bar two of the negligence claims brought against the church, and the governing statute of limitations bars one parishioner's claim of negligent supervision. We further hold the claims of defamation were properly dismissed by the district court. On remand, we direct the church to produce certain documents for in camera inspection by the district court.

## I. Factual Background and Proceedings.

**A. Covenant Reformed Church.** Covenant Reformed Church is a religiously conservative Dutch Reformed Christian Church located in Pella, Iowa. The Church is affiliated with the United Reformed Churches in North America and seeks to "teach and preach the Christian Gospel according to the Bible and the Doctrinal Standards, namely the Belgic Confession, the Canons of Dorttrecht and the Heidelberg Catechism, the Westminster Confession and Catechism." The Church is organized as a nonprofit corporation and is governed locally by a Consistory, which is comprised of a minister of the Word and a Board of Elders.

The Board of Elders oversees the operations of the church and serves as both administrative and spiritual leaders. The board is comprised of sixteen "male confessing members" of the Church who are elected to serve by the congregation in staggered terms of three years. The Church does not require elders to complete any formal theological training or be ordained, and a male congregant need only "meet the biblical requirements for office and indicate their agreement with the Form of Subscription" to be deemed qualified to serve.

Members of the Church are expected to submit to the elders with respect to matters of doctrine and spirituality, although members understand that they ultimately submit to God. Additionally, when a baptized member of the United Reformed Churches of North America makes a profession of faith, they promise to submit to the government of the Church and to its admonition or discipline should they become delinquent in either doctrine or in their personal life.

The Church Order of the United Reformed Churches in North America describes the duties of an elder as follows:

> The duties belonging to the office of elder consist of continuing in prayer and ruling the church of Christ according to the principles taught in Scripture, in order that purity of doctrine and holiness of life may be practiced. They shall see to it that their fellow-elders, the minister(s) and the deacons faithfully discharge their offices. They are to maintain the purity of the Word and Sacraments, assist in catechizing the youth, promote God-centered schooling, visit the members of the congregation according to their needs, engage in family visiting, exercise discipline in the congregation, actively promote the work of evangelism and missions, and insure that everything is done decently and in good order.

The minister of the Word is an ordained pastor who "continue[s] in prayer in the ministry of the Word, administer[s] the sacraments, catechiz[es] the youth, and assist[s] the elders in the shepherding and

discipline of the congregation." In order to serve as a minister of the Word, a candidate must demonstrate his "thoroughly reformed theological education," including

> his knowledge of the Holy Scriptures, both in the original languages and in English translations, of the Three Forms of Unity, of Christian doctrine, Christian ethics and church history; of the Church Order, and of his knowledge and aptitude with regard to the particular duties and responsibilities of the minister of the Word, especially the preparation and preaching of sermons.

Further, a candidate's personal life is examined. Once a minister of the Word is publically ordained before the congregation, he is "bound to the service of the churches for life and may change the nature of his labor only for weighty reasons, upon approval by his supervising council with the concurring advice of classis." However, the Church may remove a minister of the Word if the "pastoral relationship has been irreconcilably broken, and a minister of the Word or the council of the congregation he is serving desires to dissolve their pastoral relationship."

The Board of Elders is responsible for supervising the Church's pastor. Supervising a pastor is not a matter of doctrine and is a secular administrative function of the board. The board supervises the pastor by (1) "discuss[ing] the preaching of the Word and mak[ing] sure it coincides with the Holy Bible," (2) having "meetings twice a month [to] interact with [the pastor], [and] discuss things that need to be discussed," and (3) "go[ing] on what [the board] call[s] house visitation calls and [asking] the parishioners how the pastor is pastoring them and whether there [are] concerns or recommendations that [the board] can do to improve things."

**B. Plaintiffs and Pastor Edouard's Sexual Exploitation.** In 2003, the Church called Patrick Edouard to be its pastor and minister of

the Word. Edouard was respected and considered a "dynamic" and "very talented speaker."

Valerie Bandstra and her husband, Jason, were members of the Church at the time Edouard arrived. In 2005, Valerie and Jason were struggling with infertility, which was taking an emotional toll on Valerie. Upon learning of her struggles, Edouard began making unsolicited phone calls to Valerie's cell phone, inquiring into her personal life and fertility. In 2006, Valerie and Jason were in the process of seeking an international adoption, and Valerie decided to seek counseling from Edouard to help her cope. Edouard invited Valerie to comes see him "at his study," which was in the basement of his home.

When Valerie arrived for her first counseling session, Edouard showed her to his study in the basement. Edouard locked the door and began inquiring into Valerie's personal struggles. Edouard inquired into whether Jason was "meeting [her] needs," then proceeded to grope and kiss her. The two then engaged in sexual intercourse, and Valerie has consistently maintained the sex was against her will. Following the encounter, Edouard continued to call Valerie and insist her husband was not meeting her needs. He informed Valerie her emotional struggles stemmed from "sexual frustration" and unhappiness in marriage. Edouard urged Valerie that he was "protect[ing]" her by helping her release her sexual energy. Additionally, Edouard urged Valerie that he believed God brought them together so she could use her good fortune to help him. Edouard asked for, and Valerie ultimately loaned him, $70,000.

In October 2009, Valerie's sister, Patty, confided in Valerie that Edouard had tried to kiss her during a counseling session. Once Valerie learned what Edouard had done to her sister, she realized he

was using his pastoral position and basically the trust that people put in him as a pastor to counsel and to basically recruit women to be counseling candidates so he could get them into a position of trust and vulnerability for the very purpose of abusing them.

Soon after the conversation, Valerie called Edouard and told him he was using his position as pastor under the guise of counseling to have sexual relationships with women. Valerie then broke off contact with Edouard, although she did not inform the Church or the police of his conduct out of fear of retribution or not being believed.

Anne Bandstra and her husband, Ryan (Jason's brother), were also members of the Church when Edouard was called to be pastor in 2003. In 2008, Anne was going through a difficult time. She felt overwhelmed by a recent death in the family, marital problems, and her special needs child. Anne had been prescribed antidepressant and anxiety medications, which she was taking.

In April 2008, Edouard contacted Anne and suggested she counsel with him. Edouard invited Anne to his basement study and locked the door. He inquired into her personal life, her marital struggles, and whether she had engaged in premarital sex. Anne left the meeting to pick up her son, although she felt uneasy about Edouard's line of questioning. Edouard then began calling Anne frequently, asking to see her again. In May, during a counseling session, Edouard grabbed her and kissed her. Soon, the "counseling" evolved into regular meetings for Edouard to provide "healing" through sexual activity. Beyond sexual intercourse, Edouard would aggressively call Anne, sometimes ten to fifteen times a day.

In May 2010, Edouard informed Anne of his previous interactions with Valerie and another woman, Sandy. After the conversation, Anne "started putting all the pieces together very quickly." She began to see

"what had happened to Sandy and the abuse there" and could see "what happened to Valerie, to Patty, to Wanda, to multiple women that [were] in [her] church." Anne continued to meet with Edouard until December 10. On that day, Ryan arrived home and saw Edouard's vehicle parked outside the home. Although Ryan did not witness Anne and Edouard engaging in any sexual activity, he grew suspicious. That evening, Anne informed Ryan of Edouard's "counseling." Ryan then spoke to Jason, and the two brothers put the stories together and discovered Edouard's exploitation.

On December 13, Jason and Ryan met with three elders and informed them of Edouard's misconduct with their wives. That same evening, Edouard came to a Church meeting and one elder, Mr. Hettinga, questioned him about his conduct with Anne. Edouard admitted to inappropriate conduct with Anne and voluntarily offered his resignation. The entire Board of Elders met later that evening and voted to accept Edouard's resignation.

**C. Church Response to Clergy Abuse Allegations.** On December 15, the elders sent a letter to the entire congregation explaining they had accepted Edouard's resignation. The letter stated Edouard's "sins are of such a nature that they warrant our acceptance of [his] resignation," but did not disclose the nature of Edouard's misconduct.

On December 27, Valerie and Anne were called to appear before the elders. At the meeting, the women were asked to confess their sins with Edouard and ask for forgiveness, which they did. Valerie maintains she confessed to "idolatry," and Anne maintains she did not confess to any specific sin, although the elders understood the women to have confessed to "adultery." The elders granted Valerie and Anne

forgiveness. On December 29, the Consistory informed the congregation that it had voted unanimously to institute proceedings to depose Edouard from the office of minister of the Word.

On January 14, 2011, the Board of Elders sent another letter to the entire congregation. It stated, in relevant part,

> During the past four weeks the Consistory has learned of a prolonged period of sexual immorality and/or inappropriate contact between Patrick Edouard and multiple women congregant members. These members will remain unnamed by the Consistory and we admonish the congregation that they remain unnamed by you also. In love for the body of Christ, we must demonstrate our forgiving love for these members by being prudent with our speech and persistent in prayer for us all. We are thankful for those members who came before the Elders and eagerly desire to remain a part of us. We whole-heartedly accept them.

Although the letter did not identify Valerie or Anne by name, the congregation had become aware of which women came forward with allegations against Edouard.

A few days later, another member of the Church, Julie Hooyer, wrote to the elders and urged the elders to refrain from blaming Edouard's victims or referring to the misconduct as "affairs." Hooyer, a social worker, explained that blaming the women for Edouard's clergy abuse would significantly damage the women, as well as the congregation as a whole. Hooyer, along with Anne, Ryan, and other affected church members, soon thereafter attended an elder meeting to discuss their perspectives. They urged the elders to "form a task force to inform and counsel the Congregation, and [asked] that [the elders] write a letter to the Congregation using the terms clergy abuse and victims rather than adultery." The elders responded by asking Hooyer to submit her suggestions for the letter. After the members left the meeting, the elders discussed their ideas and noted "the perspective and suggestions

had very little Biblical or theological content or viewpoint." The elders ultimately decided it was best to "request guidance from a Christian psychologist or an attorney."

Following the meeting, Hooyer indeed sent some suggested language for a congregation letter to the elders. The elders declined to send her letter, "due in part to recommendations from law enforcement officials" and because they "felt the concepts she suggested were not necessarily Biblical and that the women involved using these concepts felt they were totally victims." In a letter circulated between the elders, the elders expressed their view that

> a false dichotomy is established when it asserts that all blame is [Edouard's]. The victims are certainly sinned against, but they are also sinning. All the parties involved failed to walk in the light (I John 1) and the women, though not bearing the same degree of responsibility as does [Edouard], were certainly responsible for their behavior and need to be called to repentance for consenting to his advances and for violating their marital covenant. They sinned sexually, even though they can rightly in one sense be denominated as victims of Patrick's machinations.

Many elders did not view Anne and Valerie's experiences as rape or sexual assault, and some even questioned whether Edouard engaged in any misconduct at all. One elder, Mr. Van Mersbergen, purportedly stated in a meeting that what happened to the women "was not clergy sexual abuse." Another elder, Mr. Hartman, stated during a meeting that "[g]rooming is a word made up by professionals. In reality, it is temptation. These women fell into temptation and they sinned." During a home visitation, another elder, Mr. Van Donselaar, stated, "Our only wish is that the women would admit what they did was wrong and ask for forgiveness like Patrick did." He further explained, "If Edouard goes to jail, there are four women who should go to jail as well." On another occasion, Van Donselaar spoke with Ryan on the phone and informed

him there was "sin on both sides" and that Edouard's conduct "was not clergy sexual abuse." On yet another occasion, Von Donselaar stated to other members of the congregation that "Edouard is more repentant than any of these women will be."

In the summer of 2011, the elders discussed inviting Dr. Diane Langberg, an expert in clergy sexual abuse, to consult with the Church. During the elder meeting, there was a motion to include in the invitation "the phrase that the women committed . . . and confessed to adultery with Patrick Edouard and were forgiven at the time of their confessions." The elders ultimately requested that Dr. Langberg come to the Church and "fully support the actions they had taken at that time." Dr. Langberg declined, citing the elders' reluctance to view the women as victims. In September, the elders again voted to invite Dr. Langberg to meet with the elders once Edouard's criminal trial was finished. Ultimately, Dr. Langberg never visited the Church.

In July of 2012, Valerie and Jason left the Church. Anne and Ryan followed suit two months later.

**D. Edouard's Criminal Conviction.** In the meantime, Edouard was charged with three counts of sexual abuse in the third degree, in violation of Iowa Code section 709.4(1) (2011), four counts of sexual exploitation by a counselor or therapist, in violation of Iowa Code section 709.15(2)(*c*), and one count of engaging in a pattern or practice of sexual exploitation by a counselor or therapist, in violation of Iowa Code section 709.15(2)(*a*). A jury trial began on August 13, 2012. Both Valerie and Anne testified. Edouard also testified in his defense, maintaining all sexual activity was consensual, and he never provided mental health services.

The jury convicted Edouard of the five sexual exploitation charges and acquitted him of the three sexual abuse charges. He was sentenced to five years in prison. We affirmed his case on appeal, concluding in relevant part that sufficient evidence existed to support a conviction of sexual exploitation. *See State v. Edouard*, 854 N.W.2d 421, 439 (Iowa 2014), *overruled on other grounds by Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 708 & n.3 (Iowa 2016). In rejecting a constitutional challenge to the sexual exploitation statute, we explained "the relationships between Edouard and each of the four women did not involve full and mutual consent. In each case, Edouard used— misused—his position of authority as a counselor to exploit the vulnerabilities of his victim." *Id.* at 444. We concluded "[t]he relationships were of a kind where 'consent might not easily be refused.' " *Id.* (quoting *Lawrence v. Texas*, 539 U.S. 558, 578, 123 S. Ct. 2472, 2484 (2003)).

**E. Civil Proceedings.** On December 7, 2012, Valerie, Anne, Ryan, and Jason brought a civil suit against Edouard, the Church, United Reformed Churches in North America, and several named elders. The plaintiffs subsequently dismissed the claims against United Reformed Churches in North America and Edouard.

Following a number of amended petitions and voluntary motions to dismiss, the plaintiffs ultimately allege the Church and elders (1) negligently declined to invite mental health counselors and clergy sexual abuse experts to work with the congregation; (2) negligently blamed the women for their sexual exploitation, causing them severe emotional harm; (3) negligently investigated Edouard's misconduct following plaintiffs' complaints; (4) negligently supervised and retained Edouard; and (5) made a number of defamatory statements against Anne

and Valerie. Throughout the duration of the suit, defense counsel and plaintiffs' counsel engaged in a number of discovery disputes, resulting in the district court reviewing a significant number of documents in camera and issuing twelve separate discovery rulings.

The district court issued three summary judgment orders. The first concluded the elders individually were immune from suit under Iowa Code section 504.901, which grants immunity to "a director, officer, or member of a [nonprofit] corporation . . . for any action taken or failure to take any action in the discharge of the person's duties," except in four specific instances. Iowa Code § 504.901 (2013). The court concluded the elders could not be held liable for any actions taken pursuant to their duties in governing a nonprofit corporation. The court then found the doctrine of issue preclusion could not be applied to the question of whether Valerie or Anne consented to their encounters with Edouard, as the jury did not specifically find, as an element of the crime of sexual exploitation, that the women did not consent to the encounters.

In the second order, the district court granted summary judgment in favor of the Church on the plaintiffs' defamation claims. The court found that all but two identified statements were qualifiedly privileged and could not give rise to a defamation action. The remaining statements, the court determined, were protected opinion statements incapable of being proven true or false. Further, the court found that no statements were made with actual malice, and thus, the plaintiffs could not overcome the qualified privilege.

In the final order, the district court granted summary judgment in favor of the Church on all negligence claims, except Ryan and Jason's negligent-supervision claims. The court found the First Amendment barred plaintiffs' first two negligence claims. Next, the court found that,

First Amendment concerns notwithstanding, summary judgment was appropriate for the negligent-investigation claim, as the elders accepted Edouard's resignation within hours of hearing of the allegations. Finally, the court determined that both Anne and Valerie's negligent-supervision claims were barred by the statute of limitations, as both women were aware of Edouard's misconduct more than two years before filing suit.

Plaintiffs moved for the district court to reconsider its rulings with respect to their negligence claims. The plaintiffs urged that the district court did not consider the continuing-violations doctrine, which would place Anne and Valerie within the statute of limitations. Although the Church contested whether the issue was preserved, the court nevertheless reached the issue. The court concluded the record did not demonstrate that the plaintiffs were incapacitated in bringing an action against the Church. Further, the court found that Iowa had not adopted the continuing-violations doctrine, and thus, the court was without jurisdiction to apply it here.

Plaintiffs appealed, and we retained the case.

**II. Standard of Review.**

We review a district court's summary judgment ruling "for correction of errors at law." *Walderbach v. Archdiocese of Dubuque, Inc.*, 730 N.W.2d 198, 199 (Iowa 2007). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Id.* (quoting Iowa R. Civ. P. 1.981(3)). When reviewing a district court's ruling, we view the record in the light most favorable to the nonmoving party. *Id.* at 199–200.

"Whether the elements of issue preclusion are satisfied is a question of law." *Winger v. CM Holdings, L.L.C.*, 881 N.W.2d 433, 445

(Iowa 2016) (quoting *Emp'rs Mut. Cas. Co. v. Van Haaften*, 815 N.W.2d 17, 22 (Iowa 2012)).  We review applications of evidentiary privileges for correction of errors at law.  *State v. Richmond*, 590 N.W.2d 33, 34 (Iowa 1999).  Our review of discovery matters is for an abuse of discretion. *Willard v. State*, 893 N.W.2d 52, 58 (Iowa 2017).  We will not disturb the court's conclusions unless the "ruling 'rests upon clearly untenable or unreasonable grounds.' "  *Id.* (quoting *Jones v. Univ. of Iowa*, 836 N.W.2d 127, 139 (Iowa 2013)).

### III.  Analysis.

A number of issues have been properly raised on appeal for our review: (1) Whether the Religion Clauses of the United States and Iowa Constitutions bar plaintiffs' negligence claims, (2) whether summary judgment was erroneously granted on plaintiffs' negligent-investigation claim, (3) whether the two-year statute of limitations bars Valerie and Anne's negligent-supervision claims, (4) whether the district court erred in dismissing plaintiffs' defamation claims, (5) whether Edouard's criminal conviction permits plaintiffs in this suit to offensively preclude any argument that the women consented to the encounters, (6) whether the district court erred in applying the clergy privilege during discovery, and (7) whether the district court abused its discretion with respect to the production of numerous identified discovery documents.  We consider each issue in turn.

### A.  Negligence Claims.

1. *Religion Clauses.*   Both the United States and Iowa Constitutions instruct that governing bodies "shall make no law respecting an establishment of religion, or prohibiting the free exercise

thereof." U.S. Const. Amend. I; Iowa Const. art. I, § 3.[1] The Free Exercise Clause preserves "the right to believe and profess whatever religious doctrine one desires." *Emp't Div. Dep't of Human Res. v. Smith*, 494 U.S. 872, 877, 110 S. Ct. 1595, 1599 (1990), *superseded by statute on other grounds*, Religious Freedom Restoration Act of 1993, Pub. L. No. 103-141, 107 Stat. 1488. The government therefore

> may not compel affirmation of religious belief, punish the expression of religious doctrines it believes to be false, impose special disabilities on the basis of religious views or religious status, or lend its power to one or the other side in controversies over religious authority or dogma[.]

*Id.* (citations omitted).

Relatedly, the Establishment Clause "forbids an official purpose to disapprove of a particular religion or of religion in general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S. Ct. 2217, 2226 (1993). The Establishment Clause guards against "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S. Ct. 2105, 2111 (1971) (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S. Ct. 1409, 1411 (1970)).

The Supreme Court has "struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other." *Walz*, 397 U.S. at 668–69, 90 S. Ct. at 1411. "The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with

---

[1]Plaintiffs have not asked us to adopt a separate analysis from federal constitutional precedent.

religion." *Id.* at 669, 90 S. Ct. at 1411–12. "Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." *Id.* at 669, 90 S. Ct. at 1412.

Over time, there has been a doctrinal shift in the Supreme Court's religious jurisprudence from separatism to neutrality. Separatism adheres to a "wall of separation between church and State" that instructs "[n]either a state nor the Federal Government can, openly or secretly, participate in the affairs of any religious organizations or groups and vice versa." *Everson v. Bd. of Educ.*, 330 U.S. 1, 16, 67 S. Ct. 504, 512 (1947) (quoting *Reynolds v. United States*, 98 U.S. 145, 164 (1878) (first quote)). Neutrality instructs that governments "must be neutral in matters of religious theory, doctrine, and practice." *Epperson v. Arkansas*, 393 U.S. 97, 103–04, 89 S. Ct. 266, 270 (1968). Under this view, "[t]he First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion." *Id.* at 104, 89 S. Ct. at 270.

In *Jones v. Wolf*, the Supreme Court found that Georgia's "neutral principles of law" approach to deciding church-related property disputes did not run afoul of the Religion Clauses. 443 U.S. 595, 604, 99 S. Ct. 3020, 3026 (1979). The Court explained that Georgia's approach "relies exclusively on objective, well-established concepts of trust and property law familiar to lawyers and judges. It thereby promises to free civil courts completely from entanglement in questions of religious doctrine, polity, and practice." *Id.* at 603, 99 S. Ct. at 3025. Although the approach still required courts "to examine certain religious documents, such as a church constitution," the Court found "[o]n balance . . . the

promise of nonentanglement and neutrality inherent in the neutral-principles approach more than compensates for what will be occasional problems in application." *Id.* at 604, 99 S. Ct. at 3026. Indeed, "[t]he neutral-principles approach cannot be said to 'inhibit' the free exercise of religion, any more than do other neutral provisions of state law governing the manner in which churches own property, hire employees, or purchase goods." *Id.* at 606, 99 S. Ct. at 3027.

2. *Tort claims and religious entities.* The First Amendment plainly prohibits the state, through its courts, from resolving internal church disputes that would require interpreting or deciding questions of religious doctrine. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 724–25, 96 S. Ct. 2372, 2387–88 (1976) (forbidding judicial inquiry into whether the church judicatory body properly followed its own rules of procedure in removing a bishop from office); *Presbyterian Church v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449, 89 S. Ct. 601, 606 (1969) (instructing if an intrachurch property dispute requires interpreting and weighing church doctrine, a court cannot intervene; if, however, neutral principles of law can be applied without determining underlying question of religious doctrine and practice, a court may intervene); *Kedroff v. St. Nicholas Cathedral*, 344 U.S. 94, 119–21, 73 S. Ct. 143, 156–57 (1952) (holding state statute that declared one faction of the Russian Orthodox Church to be the owner of certain church property an unconstitutional intrusion into religious decision-making); *Bouldin v. Alexander*, 82 U.S. (15 Wall.) 131, 139–40 (1872) (finding civil courts have no power to question ordinary acts of church discipline, requirements for membership, or whether excommunication is proper in specific cases).

Yet, when churches dispute with third parties, the question of the state's proper role becomes more complex. Third-party disputes with religious entities often involve matters of compelling state interest, such as discrimination and sexual abuse. If religious entities are de facto exempt from most tort liability, then courts may run afoul of the Establishment Clause by placing religious organizations on a higher plane than nonreligious entities. Further, the Supreme Court has explained that courts "do not inhibit free exercise of religion merely by opening their doors to disputes involving church property. And there are neutral principles of law . . . which can be applied without 'establishing' churches to which property is awarded." *Presbyterian Church*, 393 U.S. at 449, 89 S. Ct. at 606. Courts that navigate the terrain of the Religion Clauses must therefore work with a scalpel, rather than a machete.

3. *Split perspectives*. The Supreme Court has offered no direct guidance on the proper analytical framework for determining whether the First Amendment prohibits a tort claim against a religious entity. Although the First Amendment prevents courts from deciding questions of religious doctrine, state and federal courts are divided as to whether certain negligence claims actually require courts to interpret or consider religious principles.

Some state and federal courts have held the First Amendment categorically prohibits any judicial inquiry into a religious entity's operations; as such, an inquiry would necessarily entangle the court with the church's religious self-governance.[2]

---

[2]*See, e.g.*, *Roppolo v. Moore*, 644 So. 2d 206, 209 (La. Ct. App. 1994) ("[A]ny inquiry into the policies and practices of the Church Defendants in hiring or supervising their clergy raises the same kind of First Amendment problems of entanglement discussed above, which might involve[] the Court in making sensitive judgments about the propriety of the church Defendants' supervision in light of their religious beliefs . . . ." (quoting *Schmidt v. Bishop*, 779 F. Supp. 321, 332 (S.D.N.Y.

In *Gibson v. Brewer*, the Missouri Supreme Court concluded the First Amendment barred the plaintiff's claims alleging negligent hiring, retention, and supervision of a priest, but did not bar the claim of intentional failure to supervise. 952 S.W.2d 239, 246–48 (Mo. 1997) (en banc). With respect to "[q]uestions of hiring, ordaining, and retaining clergy," the court found that resolving such claims "necessarily involve[s] interpretation of religious doctrine, policy, and administration." *Id.* at 246–47. Further, the court found such an inquiry "would result in an endorsement of religion, by approving one model for church hiring, ordination, and retention of clergy." *Id.* at 247. With respect to negligent supervision, the court again concluded the claim would cause "excessive entanglement, inhibit religion, and result in the endorsement of one

_____

1991))); *Swanson v. Roman Catholic Bishop of Portland*, 692 A.2d 441, 445 (Me. 1997) (finding negligent-supervision claims are barred by the First Amendment because "import[ing] agency principles wholesale into church governance and to impose liability for any deviation from the secular standard is to impair the free exercise of religion and to control denominational governance [because p]astoral supervision is an ecclesiastical prerogative"); *Teadt v. Lutheran Church Mo. Synod*, 603 N.W.2d 816, 823 (Mich. Ct. App. 1999) (concluding a breach of fiduciary duty claim is essentially a clergy malpractice claim, as courts would have to inquire into "the legitimacy of [the] plaintiff's beliefs, the tenets of the faith insofar as they reflect upon a priest's ability to act as God's emissary and the nature of the healing powers of the church" (alteration in original) (quoting *Langford v. Roman Catholic Diocese of Brooklyn*, 677 N.Y.S.2d 436, 440 (N.Y.S. Ct. 1998))); *Mulinix v. Mulinix*, No. C2–97–297, 1997 WL 585775, at *6 (Minn. Ct. App. Sept. 22, 1997) ("Carol's claims for negligent retention and negligent supervision are fundamentally connected to issues of church governance. Adjudication of these claims would necessitate inquiry into the church's motives for not discharging Michael, as well as how the church investigates and resolves complaints concerning clergy misconduct."); *Gibson v. Brewer*, 952 S.W.2d 239, 247 (Mo. 1997) (en banc) (concluding "[a]djudicating the reasonableness of a church's supervision of a cleric—what the church 'should know'—requires inquiry into religious doctrine . . . [that] would create an excessive entanglement, inhibit religion, and result in the endorsement of one model of supervision"); *Schieffer v. Catholic Archdiocese of Omaha*, 508 N.W.2d 907, 911 (Neb. 1993) (dismissing a breach of fiduciary duty claim because it is, in essence, a claim of clergy malpractice); *Pritzlaff v. Archdiocese of Milwaukee*, 533 N.W.2d 789, 791 (Wisc. 1995) (finding an inquiry into a church's supervision of its clergy would be "prohibited by the First Amendment under most if not all circumstances," as it would require the court to determine the reasonableness of the church's decisions in light of their religious beliefs).

model of supervision." *Id.* However, the court found the tort of intentional failure to supervise clergy did not run afoul of the First Amendment. *Id.* at 248. Because the claim requires an intent to commit harm, or the disregard of a known risk, the First Amendment does not require "[r]eligious conduct intended or certain to cause harm" to be tolerated. *Id.*

Conversely, many states have adopted the opposing view and determined the First Amendment does not require categorical immunity for religious entities.[3]

---

[3] *See, e.g.*, *Moses v. Diocese of Colo.*, 863 P.2d 310, 320–21 (Colo. 1993) (en banc) ("Application of a secular standard to secular conduct that is tortious is not prohibited by the Constitution. The Supreme Court has not granted churches broad immunity against being sued in civil courts. Civil actions against clergy members and their superiors that involve claims of a breach of fiduciary duty, negligent hiring and supervision, and vicarious liability are actionable if they are supported by competent evidence in the record." (Citations omitted.)); *Malicki v. Doe*, 814 So. 2d 347, 361 (Fla. 2002) ("[I]t appears that the Free Exercise Clause is not implicated in this case because the conduct sought to be regulated; that is, the Church Defendants' alleged negligence in hiring and supervision is not rooted in religious belief. Moreover, even assuming an 'incidental effect of burdening a particular religious practice,' the parishioners' cause of action for negligent hiring and supervision is not barred because it is based on neutral application of principles of tort law." (quoting *Lukumi Babalu Aye*, 508 U.S. at 531, 113 S. Ct. at 2226)); *Bivin v. Wright*, 656 N.E.2d 1121, 1124 (Ill. App. Ct. 1995) (permitting a number of negligence claims, including supervision and retention because "[i]nquiring into whether the church was negligent in its failure to protect plaintiffs from the sexual misconduct of its minister may not call into question the church's religious beliefs or practices or subject them to analysis or scrutiny"); *F.G. v. MacDonell*, 696 A.2d 697, 702 (N.J. 1997) ("The First Amendment does not insulate a member of the clergy from actions for breach of fiduciary duty arising out of sexual misconduct that occurs during a time when the clergy member is providing counseling to a parishioner."); *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 796 (App. Div. 1997) ("Religious entities have some duty to prevent injuries inflicted by persons in their employ whom they have reason to believe will engage in injurious conduct."); *Smith v. Privette*, 495 S.E.2d 395, 398 (N.C. Ct. App. 1998) ("The Plaintiffs' claim, construed in the light most favorable to them, instead presents the issue of whether the Church Defendants knew or had reason to know of Privette's propensity to engage in sexual misconduct, conduct that the Church Defendants do not claim is part of the tenets or practices of the Methodist Church. Thus, there is no necessity for the court to interpret or weigh church doctrine in its adjudication of the Plaintiffs' claim for negligent retention and supervision." (Citation omitted.)); *Byrd v. Faber*, 565 N.E.2d 584, 590 (Ohio 1991) ("While even the most liberal construction of the First Amendment will not protect a religious organization's decision to hire someone who it knows is likely to commit criminal or tortious acts, the mere incantation of an abstract legal standard should not

In *Malicki v. Doe,* the Florida Supreme Court found the First Amendment did not bar the plaintiff's negligent hiring and supervision claims against a church. 814 So. 2d 347, 364 (Fla. 2002). The court first concluded the church did not allege its hiring or supervision of the abusive priest was done in accordance with "sincerely held religious beliefs or practices." *Id.* at 361. Because the purportedly tortious conduct was not grounded in any religious belief or practice, the Free Exercise Clause was not implicated. *Id.* Further, the court found that even if tort liability would burden a particular religious practice, the Supreme Court has held that the "incidental effect of burdening a particular religious practice" is permissible if based on "neutral application of principles of tort law." *Id.* (quoting *Lukumi Babalu Aye*, 508 U.S. at 531, 113 S. Ct. at 2226 (first quote)). With respect to negligent hiring and supervision, "[t]he core predicate for imposing liability is one of foreseeability." *Id.* at 362. Attaching liability to foreseeability of harm has a secular purpose, and the primary effect of tort liability "neither advances nor inhibits religion." *Id.* at 364. Thus, liability would not run afoul of the Establishment Clause, as courts would abstain from resolving religious doctrinal questions and would treat religious and nonreligious entities equally. *Id.* at 364–65.

---

subject a religious organization's employment policies to state scrutiny. . . . [A] plaintiff bringing a negligent hiring claim must allege some fact indicating that the religious institution knew or should have known of the employee's criminal or tortious propensities."); *Erickson v. Christenson*, 781 P.2d 383, 386 (Or. Ct. App. 1989) (rejecting a First Amendment challenge to a breach of fiduciary duty and intentional infliction of emotional distress claims, as the claims rested on a confidential, personal relationship, rather than a religious relationship); *C.J.C. v. Corp. of Catholic Bishop of Yakima*, 985 P.2d 262, 277 (Wash. 1999) (en banc) ("The First Amendment does not provide churches with absolute immunity to engage in tortious conduct. So long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs, it does not offend constitutional principles.").

4. *Merits.*

a. *Negligent response to sexual abuse allegations.* The plaintiffs allege the Church (1) willfully disregarded the advice of professional counselors and denounced established and accepted mental health treatment concepts after it learned of the abuse; and (2) ignored any duty of care it had to the plaintiffs and instead blamed them for their actions, causing them emotional harm.

To succeed on a claim for negligence, the plaintiffs must show "the existence of a duty to conform to a standard of conduct to protect others, a failure to conform to that standard, proximate cause, and damages." *Estate of Gottschalk v. Pomeroy Dev., Inc.*, 893 N.W.2d 579, 586 (Iowa 2017) (quoting *Thompson v. Kaczinski,* 774 N.W.2d 829, 834 (Iowa 2009)). Here, resolving whether the elders breached their duty to the plaintiffs would result in impermissible entanglement with religion.

Following Edouard's resignation, the elders sought to help the congregation move forward and heal. The means by which they chose to counsel and advise the congregation is outside the purview of the government. Plaintiffs argue "a reasonable church would seek assistance for parishioners and not label victims 'adulteresses.'" Yet, that is precisely the type of determination that the Religion Clauses prohibit. The elders determined that certain speakers and mental health resources were outside of their faith. A court cannot dictate what teachings and services a church offers its parishioners. Nor can we disapprove of the elders deciding, pursuant to their duty as religious authorities, that the women would be best healed by simply confessing their "sins." Because plaintiffs' first two negligence claims go to the very heart of religious decision-making, they are barred by the First Amendment.

b. *Negligent investigation.* Plaintiffs next claim the Church breached its duty of care by not conducting an investigation into Edouard's conduct after plaintiffs disclosed his abuse. We agree with the district court that First Amendment considerations notwithstanding, summary judgment is properly granted in favor of the Church. The elders were informed of Edouard's criminal conduct on December 13, 2010. A few hours later, they accepted his resignation. While the Church indeed owed a duty of care to the plaintiffs, the Church acted immediately and affirmed Edouard's removal from his office, preventing Edouard from further using his office to abuse Anne and Valerie. Accordingly, plaintiffs have not adduced sufficient evidence to generate a genuine issue of material fact as to whether the Church's failure to investigate Edouard's misconduct was the proximate cause of their injuries.

c. *Negligent supervision.*

i. *First Amendment viability.* To succeed on a negligent-supervision claim, plaintiffs must demonstrate

> (1) the employer knew, or in the exercise of ordinary care should have known, of its employee's unfitness at the time the employee engaged in wrongful or tortious conduct;
>
> (2) through the negligent . . . supervision of the employee, the employee's incompetence, unfitness, or dangerous characteristics proximately caused injuries to the plaintiff; and
>
> (3) there is some employment or agency relationship between the employee and the defendant employer.

*Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 680 (Iowa 2004) (quoting *Stricker v. Cessford Constr. Co.*, 179 F. Supp. 2d. 987, 1019 (N.D. Iowa 2001)). We first recognized the claims of negligent hiring and supervision in *Godar v. Edwards*, in which we explained employers have "a duty to exercise reasonable care in hiring individuals, who, because of

their employment, may pose a threat of injury to members of the public. . . . [S]uch a claim likewise includes an action for negligent retention and negligent supervision." 588 N.W.2d 701, 709 (Iowa 1999).

The crux of a negligent-supervision claim is an employer's failure "to exercise ordinary care in supervising the employment relationship so as to prevent the *foreseeable* misconduct of an employee from causing harm to others." 27 Am. Jur. 2d *Employment Relationships* § 375, at 885 (2014) (emphasis added). "Conduct that results in harm to a third person is not negligent or reckless unless there is a foreseeable likelihood that harm will result from the conduct." Restatement (Third) of Agency § 7.05 cmt. *d*, at 181 (Am. Law Inst. 2006). In *Godar*, a student was sexually abused by a school district's curriculum director and sued the school district for negligent hiring, retention, and supervision. 588 N.W.2d at 703–05. We determined summary judgment was properly granted, as "[t]here [was] no evidence in the record to suggest that the school district should have been suspicious of [the director's] contact with students." *Id.* at 709–10.

The Church argues that negligent-supervision claims per se are barred by the First Amendment, as a court would be called upon to "[a]djudicat[e] the reasonableness of a church's supervision of a cleric," which is an adjudication that necessarily requires inquiry into religious doctrine. *Gibson*, 952 S.W.2d at 247. We disagree.

"Whether [a church] reasonably should have foreseen the risk of harm to third parties . . . is a neutral principle of tort law." *Malicki*, 814 So. 2d at 364. In *Smith*, the Supreme Court instructed that the "right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or

proscribes).'" 494 U.S. at 879, 110 S. Ct. at 1600 (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3, 102 S. Ct. 1051, 1058 n.3 (1982) (Stevens, J., concurring in the judgment)). The United States Court of Appeals for the Fifth Circuit has further explained, "The First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to the secular components of these relationships." *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 335–36 (5th Cir. 1998). The court reasoned that categorical immunity "impermissibly place[s] a religious leader in a preferred position in our society." *Id.* at 336.

While the decision whether to invite certain speakers, or use certain rhetoric, is protected religious decision-making, reasonable supervision of an employee is a principle of tort law that applies neutrally to all employers. Further, the Church confirmed during oral argument that the Church's supervision, or lack thereof, was not grounded in any religious doctrine or teachings. Although the elders and Edouard were both religious figures, working pursuant to their deeply held faiths, this status does not "excuse [them] from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Smith*, 494 U.S. at 879, 110 S. Ct. at 1600. Indeed, any burden that may result from imposing a secular duty to inquire into the whereabouts and potential misconduct of a pastor is no more than an "incidental effect of a generally applicable" tort principle, which does not offend the First Amendment. *Id.* at 878, 110 S. Ct. at 1600.

Moreover, the resolution of questions of foreseeability and reasonableness will not implicate any Establishment Clause concerns. To discern whether it was foreseeable that Edouard was engaging in criminal conduct, a court must determine what the elders knew or

should have known. In turn, a court must decide whether the supervision of Edouard, in light of the foreseeable risks, was reasonable. A court need not interpret any doctrine, nor otherwise impermissibly entangle itself with religion, in order to conclude the elders owed a duty to its parishioners to supervise Edouard. Indeed, failing to hold religious employers accountable for their failure to supervise their employees would grant immunity to religious figures, which the state may not do. Accordingly, we find plaintiffs' negligent-supervision claims are not barred by the Religion Clauses.

ii. *Statute of limitations.* The district court concluded that, First Amendment limitations aside, both Valerie's and Anne's negligent-supervision claims were barred by the statute of limitations. *See* Iowa Code § 614.1(2) (providing the limitations period for personal injury claims is two years). Plaintiffs allege that the limitations period only began running once Anne and Valerie knew or should have known they were victims of Edouard's scheme *and* the Church failed to prevent his misconduct. According to the plaintiffs, the earliest date the women could have been put on notice was December 10, 2010, when the family learned of the systemic abuse. In the alternative, plaintiffs ask that we apply the continuing-violations doctrine and determine that plaintiffs could not have brought their claims while they remained under the control of the Church.

Statutes of limitations are commonly justified on judicial efficiency and fairness grounds and are best understood as "an accommodation of competing interests." *Borchard v. Anderson,* 542 N.W.2d 247, 251 (Iowa 1996).

> The plaintiff wishes to have a reasonable time to bring the suit in order that he [or she] may identify the various acts of negligence, the parties responsible, and the extent of his [or

her] damages. The defendant, on the other hand, seeks to avoid having to defend against stale claims because witnesses' memories may fade or other evidence may be lost. The limitation period is also designed to bring repose and an end to the assertion of claims. It must be admitted that in this area any bright line rule has the potential for providing a hardship in an individual case.

*Id.* (alterations in original) (quoting *LeBleau v. Dimig*, 446 N.W.2d 800, 803 (Iowa 1989)).

The "potential for providing a hardship" is perhaps the most prevalent in civil claims deriving from traumatic instances of sexual abuse or exploitation. *Id.* In *Callahan v. State*, we discussed the relationship between childhood sexual abuse and delayed discovery of the elements of a legal claim. 464 N.W.2d 268, 271 (Iowa 1990).

[T]he term "Post-Traumatic Stress Disorder" (PTSD) is used to describe the psychological impact of traumatic events on a person. The disorders resulting from these events may be either a combination of physical and mental disorders, or solely a residual mental incapacity continuing after a physical injury has healed. PTSD can exist even when a trauma victim has not suffered demonstrable physical injury. A sexually abused child who suffers from this disorder may exhibit symptoms of unnatural secrecy, feelings of helplessness or entrapment, delayed or conflicting disclosure, retraction, and various phobias. A practical consequence is that the child may repress or delay disclosing the sexual abuse until after the pertinent personal injury statute of limitations has run.

*Id.* (quoting James Wilson Harshaw III, Comment, *Not Enough Time?: The Constitutionality of Short Statutes of Limitations for Civil Child Sexual Abuse Litigation*, 50 Ohio St. L.J. 753, 756–57 (1989)).

We also noted in *Callahan* that the legislature had responded to widespread concerns about the viability of childhood sexual abuse claims and adopted a specific statutory discovery rule to preserve their claims. *Id.* at 272. Although the legislature declined to adopt a corresponding statute for adult victims of sexual abuse, adult victims are nevertheless

aided by application of the discovery rule if they can adduce sufficient evidence that they discovered the illegality within two years of filing suit, even if the abuse took place long before.

Under the discovery rule, a victim's claim will begin to accrue once she is "aware of the existence of a problem," even if she does not yet have a full understanding of the abuse's ultimate effects. *Borchard*, 542 N.W.2d at 251. Further, the limitations period begins not with actual knowledge, but rather once the plaintiff is placed on inquiry notice. *Vossoughi v. Polaschek*, 859 N.W.2d 643, 652 n.4 (Iowa 2015). "A party is placed on inquiry notice when a person gains sufficient knowledge of facts that would put that person on notice of the existence of a problem or potential problem." *Id.* (quoting *Buechel v. Five Star Quality Care, Inc.*, 745 N.W.2d 732, 736 (Iowa 2008)).

The nature of Edouard's sexual exploitation prevented the women from understanding at the outset that his conduct was illegal. Gary Schoener, a psychologist who offered an affidavit explaining the impact of clergy sexual abuse, explained that victims often experience confusion about what has taken place, difficulty explaining the problem or giving it a name, shame and guilt following even minor incidents, and fear of retribution. Thus, plaintiffs argue Valerie and Anne were not on notice from the outset of the abuse but, rather, when they realized they were one of many victims and that the Church had done nothing to prevent or remedy it.

Even under plaintiffs' proposed understanding, Valerie's claim remains outside the limitations window. Edouard initially exploited Valerie in 2006. Edouard continued to pursue and contact her until October 2009. In October 2009, Valerie spoke with her sister Patty and

learned that Edouard had tried to kiss her during a counseling session. Valerie explained that the conversation caused her to realize

> he was using his pastoral position and basically the trust that people put in him as a pastor to counsel and to basically recruit women to be counseling candidates so he could get them into a position of trust and vulnerability for the very purpose of abusing them.

Following that realization, she called Edouard and accused him of clergy sexual abuse "in so many words." Thus, Valerie knew of Edouard's scheme of sexual exploitation in October 2009 and was then placed on inquiry notice of the elders' unreasonable supervision of Edouard. Because Valerie had notice of the elders' allegedly tortious conduct more than two years before filing suit, her claim is barred by the statute of limitations.

Anne's period of exploitation began in April 2008. The district court erroneously determined Anne knew the conduct was tortiously "wrong" from the outset. As explained above, the nature of clergy misconduct prevents victims from understanding that the behavior is exploitive and unlawful. Yet, Anne stated in her deposition that in May 2010, Edouard called her and informed her that he had had prior sexual relationships with other female members of the congregation. After the phone call, Anne "started putting all the pieces together very quickly." In her deposition, Anne stated that at that time, she realized,

> When you get out of the control of that man, you can see what's going on. . . . You could put all those pieces together, what had happened to Sandy and the abuse there. You could see what happened to Valerie, to Patty, to Wanda, to multiple women that are in our church. . . . It's so hard to explain, but when he has that control over all these women's minds—he had that over Sandy, he had that over Valerie. He even had that over Patty and Wanda. He loves that power.
>
> Q. Okay. Were there other pieces—other things that you looked to that—that kind of fell into place that you said

"Now—Now I see what was going on. Now I see what he was doing"? A. Yes.

Thus, Anne knew of Edouard's pattern of using his position to abuse women in May 2010. This placed her on inquiry notice of the elders' failure to supervise Edouard properly. Anne's limitations period, therefore, began to run in May 2010 for encounters that occurred before her realization and began running immediately for all encounters after May 2010.

However, Edouard continued to criminally exploit Anne, under the elders' supervision, until December 10, 2010—the date of the last encounter between Edouard and Anne. Plaintiffs filed suit on December 7, 2012. Because Anne was the victim of Edouard's criminal exploitation, and the Church potentially engaged in negligent supervision during the limitations period, Anne's claim is not entirely time-barred. Anne therefore has an actionable claim against the Church for its failure to supervise Edouard during the limitations period. *Cf. Farmland Foods v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 741 (Iowa 2003) ("[T]he existence of past acts and the employee's prior knowledge of their occurrence . . . does not bar employees from filing charges about related discrete acts so long as the acts are independently discriminatory and charges addressing those acts are themselves timely filed." (second alteration in original) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113, 112 S. Ct. 2061, 2072 (2002))).

Plaintiffs further allege that even if Valerie and Anne had inquiry notice outside of the limitations period, they were unable to act upon their knowledge, and thus the limitations period should be tolled until they were free from the Church's control. Plaintiffs exclusively rely on *Callahan* to support their theory. In *Callahan*, a child was abused from

the age of four to age seven, but did not disclose his abuse to his mother until several years later. 464 N.W.2d at 269. When his mother brought suit individually and as her son's next friend, the district court dismissed the claims because the son's abuse took place outside the limitations period. *Id.* We reversed, explaining at issue was not the son's knowledge of the abuse, but rather his mother's. *Id.* at 273. Because there were sufficient facts in the record for a jury to conclude that, despite her best efforts, the mother could not have discovered her child's abuse until he disclosed it under intensive counseling, we held summary judgment was improper. *Id.* *Callahan* did not address the victim's ability to *act* on knowledge of sexual abuse, but rather underscores that the psychological ramifications of sexual abuse may affect when an injury can reasonably be discovered. Here, both Valerie and Anne discovered the nature of Edouard's scheme, and thus their injuries, more than two years prior to filing suit. Thus, reliance on *Callahan* is inapposite.

As an alternative to the discovery rule, plaintiffs ask that we allow Valerie and Anne's claims to proceed, for their entire period of exploitation, under the continuing-violations doctrine. Specifically, plaintiffs ask that we apply the "cumulative wrongs" theory to the Church's misconduct. Although the parties dispute whether we have in fact adopted the continuing-violations theory, we need not resolve that issue, as we do not find the theory applicable in this case.

Plaintiffs cite *Page v. United States* to support their cumulative wrongs theory. *See* 729 F.2d 818, 821–22 (D.C. Cir. 1984). In *Page*, the court explained, "[W]hen a tort involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the tortious conduct ceases." *Id.* at 821 (quoting *Donaldson v. O'Connor*, 493 F.2d 507, 529 (5th Cir. 1974), *overruled on other grounds*, 422 U.S. 563,

95 S. Ct. 2486 (1975)). The doctrine applies when "no single incident in a continuous chain of tortious activity can 'fairly or realistically be identified as the cause of significant harm,' [and] it seems proper to regard the cumulative effect of the conduct as actionable." *Id.* at 821–22 (quoting *Fowkes v. Pennsylvania R.R.*, 264 F.2d 397, 399 (3rd. Cir. 1959)). Here, however, the Church's negligent supervision of Edouard's criminal conduct did not become actionable *because of* its continuous nature. Each sexual encounter was an act of sexual exploitation, which was potentially facilitated by the elders' negligent supervision. Plaintiffs' claims are not derived from a cumulative wrong, but from reoccurring wrongs.

In summary, we find Valerie's negligent-supervision claim is barred by the statute of limitations and Anne may proceed on a negligent-supervision claim derived from any exploitation that occurred within the two-year limitations period.

**B. Defamation Claims.**

1. *Defamation principles.* Our defamation law "embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks. An action for defamation . . . is based upon a violation of this right." *Schlegel v. Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998) (quoting 50 Am. Jur. 2d *Libel and Slander* § 2, at 338–39 (1995)). We recognize two types of defamation: per quod and per se. *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996).

Defamation per quod "refer[s] to facts or circumstances beyond the words actually used to establish the defamation." *Id.* To succeed in proving defamation per quod, a party must prove six elements: (1) publication, (2) a defamatory statement, (3) falsity, (4) maliciousness,

(5) the statement was of or concerning the party, and (6) a resulting injury. *Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa 2013).

Defamation per se, alternatively, exists when a statement has a "natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse." *Johnson*, 542 N.W.2d at 510 (quoting *Prewitt v. Wilson*, 128 Iowa 198, 202, 103 N.W. 365, 367 (1905)). If a statement is defamatory per se, the elements of falsity, malice, and injury are legally presumed and the statement is actionable without proof of the same. *Schlegel*, 585 N.W.2d at 222.

"An attack on the integrity and moral character of a party is libelous per se." *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984). We have found defamation per se in statements accusing an individual of being a liar, *Wilson v. IBP, Inc.*, 558 N.W.2d 132, 139 (Iowa 1996), accusing an individual of an indictable crime of moral turpitude or that carries a jail sentence, *Rees v. O'Malley*, 461 N.W.2d 833, 835 (Iowa 1990), and accusing an individual of falsifying information, *Vinson*, 360 N.W.2d at 116. We have also characterized an accusation of adultery as defamation per se. *Arnold v. Lutz*, 141 Iowa 596, 597–98, 120 N.W. 121, 121 (1909).

To prove publication, a party must demonstrate the challenged communication was made "to one or more third persons." *Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). The third person must not only hear the statement, but also understand it to be defamatory. *Id.* Whether a listener understands a statement to be defamatory requires viewing the statements "in the context of the surrounding circumstances and within the entire communication." *Id.* As well, a speaker may be

liable for "damages resulting from the repetition of the statement if the repetition was reasonably foreseeable." *Id.* at 222.

With respect to falsity, "statements regarding matters of public concern that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution." *Yates v. Iowa W. Racing Ass'n,* 721 N.W.2d 762, 771 (Iowa 2006). Although there is no strict dichotomy between "opinion" and "fact," we must consider "whether the alleged defamatory statement can reasonably be interpreted as stating actual facts and whether those facts are capable of being proven true or false." *Id.* Under this framework, "statements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false." *Id.* (quoting *Moldea v. N.Y. Times Co.,* 22 F.3d 310, 313 (D.C. Cir. 1994)). Importantly, "[t]he statement that the plaintiff must prove false is not the literal wording of the statement but what a reasonable reader or listener would have understood the author to have said." *Id.*

We utilize a four-part test to determine whether a statement is factual or a protected opinion. The first factor is "whether the alleged defamatory statement 'has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous.'" *Id.* at 770 (quoting *Ollman v. Evans,* 750 F.2d 970, 979 (D.C. Cir. 1984)). The second factor is "the degree to which the [alleged defamatory] statements are . . . objectively capable of proof or disproof[.]" *Id.* (quoting *Ollman,* 750 F.2d at 981) (alterations in original). The third factor is "the context in which the alleged defamatory statement occurs." *Id.* The final factor we consider is "the broader social

context into which [the alleged defamatory] statement fits." *Id.* (alteration in original) (quoting *Ollman*, 750 F.2d at 983).

Otherwise, actionable statements may be nevertheless rendered nonactionable when spoken or written pursuant to a qualified or absolute privilege. A communication is qualifiedly privileged if

> (1) the statement was made in good faith; (2) the defendant had an interest to uphold; (3) the scope of the statement was limited to the identified interest; and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.

*Barreca v. Nickolas*, 683 N.W.2d 111, 118 (Iowa 2004). We have previously decided that "communications between members of a religious organization concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged." *Kliebenstein v. Iowa Conference of United Methodist Church*, 663 N.W.2d 404, 407 (Iowa 2003) (quoting 50 Am. Jur. 2d *Libel and Slander* § 340, at 663 (1995)).

Qualified privilege may be lost, however, if the speaker abuses the privilege by speaking with actual malice or excessively publishing the statement "beyond the group interest." *Id.* (quoting *Brewer v. Second Baptist Church of L.A.*, 197 P.2d 713, 717 (Cal. 1948) (en banc)). A statement is made with actual malice if the speaker "acted with knowing or reckless disregard of the truth of the statement." *Barreca*, 683 N.W.2d at 121. In the clergy context, a statement loses its privilege if made to individuals outside the congregation. *Kliebenstein*, 663 N.W.2d at 407. In *Kliebenstein*, for example, we determined a church's statement that described the plaintiff as the "spirit of Satan" was not qualifiedly privileged, as it was made to members of the general public and the term had an offensive, secular meaning. *Id.* at 407–08.

2. *Merits.* We have identified eleven statements that plaintiffs contend are actionable, defamatory communications.[4] We will address each statement in turn.

First, one day in early 2011, Ryan was experiencing significant distress from the circumstances and threatened to hurt himself. He reached out to Jason, who called several individuals to come and stay with Ryan. That evening, Elder Hettinga told the plaintiffs, in front of the other third parties present, that "you are not victims." Plaintiffs allege this statement is defamatory. We are unable to discern from the record whether the third parties present were exclusively Church members or if others were there as well. Accordingly, we cannot conclude the statements are qualifiedly privileged. However, we find the statement is a protected opinion and nonactionable. At the time of this incident, Edouard's conduct had just been revealed. He had not been charged, tried, or convicted. Moreover, the statement was made in the context of the dispute between the parties as to whether the women should be referred to as "victims" by the elders when communicating with the congregation. While many may find Hettinga's statement offensive, whether the women are victims or sinners in need of forgiveness is not objectively capable of proof or disproof. *Yates*, 721 N.W.2d at 770.

Second, on the same evening and under the same circumstances as the first statement, Elder Hettinga additionally stated, "Unless . . . he was holding a knife to her throat, it wasn't rape." Hettinga purportedly made this statement in response to Ryan's claim that his sister-in-law, Valerie, had been raped. Hettinga disagreed. Again, Edouard had not

---

[4]The Church disputes whether many of these statements actually were made. For summary judgment purposes, we will presume these communications were made in the manner alleged.

yet been convicted or acquitted, and the men were likely not speaking in terms of the legal definition of rape. While Hettinga's statement similarly may offend a great many people, others may believe that without a threat of force, rape has not occurred. Indeed, some states still require a showing of force as an element of rape. *See, e.g.,* Mass. Gen. Laws Ann. ch. 265, § 22 (West, Westlaw current through ch. 63 of 2018 2d Ann. Sess.) (defining rape as sexual intercourse compelled "by force *and* against [the] will" of the other (emphasis added)). Accordingly, a "consensus of understanding" does not exist as to whether rape exists without a threat of force. *Yates,* 721 N.W.2d at 770. Moreover, given dialogue between the Church and the plaintiffs as to whether the women were "victims" or "sinners," the context of Hettinga's statement supports a finding that he was expressing his subjective belief about the plaintiffs' status as victims, rather than communicating a verifiable fact.

Third, during a home visitation with members of the Church, Elder Van Donselaar stated, "[O]ur only wish is that the women would admit what they did was wrong and ask for forgiveness like [Edouard] did." Again, while some may find Van Donselaar's statement offensive, he was speaking as an elder to members of the Church about whether other members should ask for forgiveness for their alleged sins. His statement is qualifiedly privileged, as it is a "communication[] between members of a religious organization concerning the conduct of other members or officers in their capacity as such." *Kliebenstein,* 663 N.W.2d at 407 (quoting 50 Am. Jur. 2d *Libel and Slander* § 340, at 663). Plaintiffs argue that the women have always described the conduct as nonconsensual, and thus Van Donselaar spoke with actual malice. However, at the time of the communication, Edouard had not yet been convicted, and

Van Donselaar therefore did not speak with a "knowing or reckless disregard of the truth." *Barreca*, 683 N.W.2d at 121.

Fourth, on the same evening as the above statement, Elder Van Donselaar further stated, "If Edouard goes to jail, there are four women who should go to jail as well." This statement is a nonactionable opinion. Whether the women are morally deserving of criminal punishment is not objectively capable of proof or disproof and is therefore protected by the First Amendment.

Fifth, during a Board of Elders meeting, Elder Van Mersbergen stated Edouard's conduct "was not clergy sexual abuse." This statement is qualifiedly privileged, as it was made by and about members of a religious organization in their capacity as such. Moreover, this statement was made prior to Edouard's conviction, and thus, Van Mersbergen did not speak with actual malice.

Sixth, Elder Van Donselaar stated in a phone call with Ryan that Edouard's conduct "was not clergy sexual abuse." Akin to the prior statement, this communication is qualifiedly privileged and was spoken without actual malice.

Seventh, on the same phone call with Ryan, Elder Van Donselaar stated, "Edouard is more repentant than any of the women will ever be." At first glance, it appears the statement is nonactionable because it is not false. Anne and Valerie have always maintained they have nothing to "repent" as they were victims in Edouard's sexual exploitation scheme. Yet, given the context of the statements, the true message here is not that the women are factually unrepentant, but rather that they *should* be repentant because they too sinned. However, the latter notion is similarly nonactionable for the same reasons as the first communication.

Whether, in the eyes of an elder, the women are victims or sinners in need of forgiveness is not objectively provable.

Eighth, during a Board of Elders meeting, Elder Hartman stated, "Grooming is a word made up by professionals. In reality, it is temptation. These women fell into temptation and they sinned." Similar to the fifth statement, Hartman was speaking to and about members of the church in their capacity as such. Accordingly, the statement is privileged, and plaintiffs have not adduced evidence to demonstrate Hartman was speaking with actual malice.

Ninth, in a letter to the congregation dated January 14, 2011, the elders informed the parishioners that there was "sexual immorality and/or inappropriate contact" between Edouard and "multiple women congregant members." The letter urged the congregation to demonstrate "forgiving love" to these female members. The statements contained in the letter are qualifiedly privileged, and there is no evidence in the record that the elders were speaking with actual malice. Rather, the record demonstrates the elders sincerely believed that, pursuant to their faith, the women were in need of forgiveness, and Edouard's criminal conduct was "sexual immorality."

Tenth, on September 19, 2012, the elders sent a letter to the plaintiffs expressing the elders' forgiveness for the plaintiffs' sin of adultery. While accusing a party of adultery is indeed defamation per se, this statement lacks the necessary element of publication, as it was sent exclusively to the plaintiffs.

Eleventh, on December 10 and 11, 2012, the elders prepared and read statements to the congregation. The elders stated,

> God calls [it] sin when someone who is married willingly has intimate relations with a person who is not their spouse and we have learned that other members rejected the

manipulations of a man who never should have lead them astray.

We find this statement is qualifiedly privileged. Although it does not directly name Anne and Valerie, nor Edouard's other victims, by name, a reasonable listener would understand the elders to be speaking about the women involved in Edouard's criminal scheme. The elders were therefore speaking to members of the church about the conduct of other members in their capacity as such. At this time, Edouard had been convicted of sexual exploitation, and plaintiffs therefore argue that the elders spoke with actual malice by inferring that Edouard's victims had "willing" relations with him. However, Edouard was acquitted of sexual abuse, and the crime of sexual exploitation does not contain a consent element. We find that plaintiffs have not proven that the elders spoke with a "knowing or reckless disregard of the truth," as a reasonable person could understand Edouard's acquittal to mean the jury believed the encounters were consensual. *Barreca*, 683 N.W.2d at 121. Thus, the statement remains qualifiedly privileged.

As a final matter, the plaintiffs contend that the Church necessarily abused any qualified privilege by excessively publishing their statements in a manner that permitted the news media to obtain and publish information about Edouard's criminal misconduct. However, plaintiffs have not adduced any evidence to demonstrate the elders were negligent in their communications or otherwise responsible for the story ultimately ending up in the press. Accordingly, summary judgment was properly granted on all of plaintiffs' defamation claims.

**C. Issue Preclusion.** Plaintiffs wish to use the doctrine of offensive issue preclusion, based on Edouard's criminal convictions, to prevent the Church from stating or otherwise implying at trial that the

plaintiffs consented to their encounters with Edouard. The district court declined to apply the doctrine, as the crime of sexual exploitation by a counselor does not require the jury to find, as an element, that the plaintiffs did not consent.

Generally, issue preclusion, or collateral estoppel, "prevents parties to a prior action in which judgment has been entered from relitigating in a subsequent action issues raised and resolved in the previous action." *Hunter v. City of Des Moines*, 300 N.W.2d 121, 123 (Iowa 1981). A party seeking to preclude an issue from being litigated must satisfy four prerequisites:

> (1) the issue concluded must be identical; (2) the issue must have been raised and litigated in the prior action; (3) the issue must have been material and relevant to the disposition of the prior action; and (4) the determination made of the issue in the prior action must have been necessary and essential to the resulting judgment.

*Id.*

Offensive issue preclusion contemplates a party that is "a stranger to the judgment . . . rely[ing] upon a former judgment as conclusively establishing in his favor an issue which he must prove as an essential element of his cause of action or claim." *Id.* "Although offensive use of issue preclusion is allowed in Iowa, it is more restrictively and cautiously applied than defensive issue preclusion." *Buckingham v. Fed. Land Bank Ass'n*, 398 N.W.2d 873, 876 (Iowa 1987) (citation omitted). Offensively invoking the doctrine of issue preclusion requires proving two additional elements:

> (1) whether the opposing party in the earlier action was afforded a full and fair opportunity to litigate the issues . . ., and (2) whether any other circumstances are present that would justify granting the party resisting issue preclusion occasion to relitigate the issues.

*Winger*, 881 N.W.2d at 451 (alteration in original) (quoting *Emp'rs Mut. Cas. Co.*, 815 N.W.2d at 22).

Edouard was convicted of sexual exploitation by a counselor or therapist in violation of Iowa Code section 709.15(2)(*c*). The jury instructions required the jury to find the following four elements:

> (1) On or about April 2008, through 2010, the defendant engaged in sexual conduct with Anne Bandstra.
>
> (2) The defendant did so with the specific intent to arouse or satisfy the desires of either the defendant or Anne Bandstra.
>
> (3) The defendant was then a counselor or therapist.
>
> (4) Anne Bandstra was then receiving mental health services from the defendant, or had received mental health services from the defendant within one year prior to the conduct.

The jury therefore did not determine whether Anne's encounter with Edouard was consensual. "The fundamental rationale of collateral estoppel or issue preclusion commands that the doctrine only be applied to matters that have been actually decided." *City of Johnston v. Christenson*, 718 N.W.2d 290, 301 (Iowa 2006). Because the victim's nonconsent is not an element of sexual exploitation by a counselor or therapist, the issue was not "necessary and essential to the resulting judgment." *Hunter*, 300 N.W.2d at 123. Accordingly, the district court did not err in determining that issue preclusion is inappropriate in this instance.

**D. Clergy Privilege.** The plaintiffs further dispute the court's application of the clergy privilege throughout discovery. The plaintiffs challenge the applicability of the privilege to many specific documents, including the minutes of Board of Elder meetings.

> The clergy privilege, as codified by the legislature, instructs
>
> a member of the clergy shall not be allowed, in giving testimony, to disclose any confidential communication properly entrusted to the person in the person's professional

> capacity, and necessary and proper to enable the person to discharge the functions of the person's office according to the usual course of practice or discipline.

Iowa Code § 622.10(1). Accordingly, for a party to avail itself of the privilege, it must demonstrate that a communication is "(1) confidential; (2) entrusted to a person in his or her professional capacity; and (3) necessary and proper for the discharge of the function of the person's office." *Richmond*, 590 N.W.2d at 35.

The statute embodies the long-standing public policy that "the human being does sometimes have need of a place of penitence and confession and spiritual discipline. When any person enters that secret chamber, this statute closes the door upon him, and civil authority turns away its ear." *Reutkemeier v. Nolte*, 179 Iowa 342, 350, 161 N.W. 290, 293 (1917). Earlier versions of the statute cloaked communications with "minister[s] of the gospel" and "priest[s] of any denomination." *Id.* at 346, 161 N.W. at 292 (quoting Iowa Code Supp. § 4608 (1913)). Today, the statute vests the privilege within "member[s] of the clergy." Iowa Code § 622.10(1) (2017).

Plaintiffs seize upon the word "clergy" and insist that, here, the elders are not members of the clergy and therefore do not qualify. Although a male member of the church need not complete formal theological training, elders are, nevertheless, formally regarded as spiritual leaders. The Church's governing documents task the elders with "continuing with prayer," "maintain[ing] the purity of the Word and Sacraments," "assist[ing] in catechizing the youth," "visit[ing] the members of the congregation according to their needs," and "engag[ing] in family visiting." Parishioners are expected to submit to the elders' authority with respect to matters of doctrine and spirituality. Accordingly, applying the priest–penitent privilege to counseling or

guidance communications with elders furthers the express purpose of the privilege, and the district court correctly extended the privilege to otherwise qualifying elder communications. *See Reutkemeier*, 179 Iowa at 346, 161 N.W. at 292 ("What is a 'minister of the gospel' within the meaning of this statute? The law as such sets up no standard or criterion. That question is left wholly to the recognition of the 'denomination.' ").

Importantly, however, the elders are more than spiritual leaders. They also oversee the Church's operations and perform supervisory and administrative tasks. Communications related to governance or administration are plainly outside the scope of the clergy privilege, as they are not related confidential communications necessary to discharge the elders' *religious* duties. For example, the Church confirmed during oral argument that supervising a minister is a purely secular task. Accordingly, any statements relating to the elders' supervision of Edouard, or lack thereof, are not covered by the privilege, as they are not necessary for the discharge of the elders' religious duties. The clergy privilege ensures members of the Church may confide in an elder without fear of a subsequent disclosure in a judicial proceeding. It does not, however, encompass administrative or otherwise secular communications that happen to be uttered by an elder with some religious duties.

Plaintiffs have requested we review the court's application of the clergy privilege to several documents identified only by Bates number. Because we cannot view the documents themselves, we are unable to determine whether nonprivileged information was erroneously withheld. On remand, plaintiffs may petition to have certain orders reconsidered in light of the principles we have clarified today. With respect to the Board

of Elder meeting minutes, any discussion of confidential communications made pursuant to the elders' duties as religious counselors are privileged. Communications relating to the elders' secular duties, such as supervision, governance, and administration, are beyond the scope of the privilege and may not be withheld.

**E. Disputed Documents.** In cases that involve sensitive issues such as assault and exploitation, we understand that the litigation process may impose hardship on clients and, sometimes, even counsel. Our rules of professional responsibility and standards of decorum instruct that counsel should seek to resolve disputes promptly, in a civil and reasonable manner, even in cases touching upon personal and trying topics. On remand, we emphasize counsels' obligation to act in good faith when resolving discovery disputes and avoid unnecessary court involvement.

The final matter in this case is the disputed production of over 100 documents, identified on appeal only by Bates number. Plaintiffs allege the listed Bates numbers represent challenged documents that were either never submitted to the court for review or were deemed nonprivileged yet never produced.

The first group of documents[5] are indeed documents that were deemed nonprivileged yet never produced. The documents, relating to Reverend Barnes, were challenged in the plaintiffs' second motion to compel. They were listed in the defendant's privilege log, reviewed by the court, and determined not to be privileged in the court's second supplemental ruling on plaintiffs' motion to compel. It appears from the

---

[5]Covenant Reformed Church (CRC): 0095, 0098, 0100, 0110, 0111–12, 0113–14, 0137, 0138, 0139, 0143, 0144–45, 0148, 0149, 0151, 0154, 0155–56, 0164, 0165–66, 0167–69, 0173, and 0174.

record that defendant never produced these documents, in contravention of the court's order. Thus, defendant must produce these documents on remand.

The second group of documents[6] also relate to Reverend Barnes. In the court's ruling on plaintiffs' second motion to compel, it instructed that the defendant need not produce any documents identified as privileged in its log. All of the documents in this group were identified as privileged in the defendant's log. The court then ordered that if plaintiffs "feel that some specific letter should be produced, it will be incumbent on them to identify that specific letter . . . within 20 days of the filing of this ruling." Based on our review of the record, it appears plaintiffs failed to identify these documents within twenty days. Accordingly, the documents in this group need not be produced.

The third group of documents[7] are minutes of three Executive Committee meetings in the summer of 2014—over three years after Edouard's misconduct came to light. The documents appear to relate to an investigation into David Te Grotenhuis and Steven Runner. The district court's ruling on plaintiffs' second motion to compel found the investigation to be outside the scope of the lawsuit and not discoverable. We agree and find these documents need not be produced on remand.

The fourth group of documents[8] are various papers that the defense claimed as privileged in their February 29 and March 16, 2016

---

[6]CRC: 0096–97, 0099, 0106, 0109, 0115, 0117, 0118–19, 0120, 0121–22, 0123, 0124, 0125–26, 0127–28, 0129, 0130–32, 0133, 0134, 0135, 0136, 0140, 0142, 0157–58, 0159–60, 0175, 0176, 0177, 0178–79, 0180, 0181, 0182–83, 0184, 0185, 0186, 0187–88, 0189, 0190, 0191–92, 0193, 0194–95, 0196–97, 0198–99, 0200–02, 0203–04, 0205, 0206–07, 0208, 0209, and 0211–12.

[7]CRC: 0267, 0268, and 0269.

[8]CRC 2329; De Jong 093–0102; Te Grotenhuis 0105–06; Hartman: 0229, 0230, 0231, 0313–14, 0314–17, 0323, 0346, and 0377–78.

supplemental production and privilege log. The plaintiffs promptly challenged each of these documents and requested they be submitted to the court for in camera review in two letters to defense counsel dated March 28 and April 1, 2016. The defendant never submitted the documents for review. Although the plaintiffs challenged the documents before the discovery period closed on April 21, the district court erroneously found that "discovery is closed," and the "documents now challenged by plaintiffs were identified as privileged long ago and not challenged until now." Because plaintiffs' challenges were timely, defendant must produce the documents to the court for in camera review on remand.

The fifth group of documents[9] are notes of several Board of Elder meetings. Defendant initially produced the documents to the plaintiffs, yet improperly redacted "nonresponsive" information from the documents. However, after a challenge from the plaintiffs, it appears defendant produced complete copies of these pages in its March 1, 2016 supplemental production. Thus, plaintiffs have already received these documents.

The final group of documents[10] were included in plaintiffs' fourth motion to compel. Although the documents are identified as relating to "Te Grotenhuis," a thorough review of the record has failed to adduce any indicia of what these documents actually contain. We therefore cannot discern whether the documents relate to the investigation of David Te Grotenhuis, which was deemed beyond the scope of the suit or some other discoverable matter. Because plaintiffs appear to have challenged

---

[9]Veenstra: 001, 002, 003, 004, 005, 006, 009, and 011.

[10]Te Grotenhuis: 0107–10, 0111–14, 0115–17, 0118–19, 0120, 0121–22, 0125–27, and 0128.

these documents prior to the close of discovery, defendant must submit these documents for in camera review on remand.

Plaintiffs further challenge several individual documents. One such document, CRC–2379, is the minutes of a Board of Elders meeting. A portion of the document was challenged and deemed privileged in the court's ruling on plaintiffs' first motion to compel. However, when defense counsel produced the document, it redacted an additional portion of the document, Article 27, and claimed it was privileged. The plaintiffs challenged the new redaction in a letter dated March 28, 2016, yet defense counsel never submitted the newly redacted document for in camera review. Accordingly, plaintiffs challenged the document within the discovery period, and counsel must submit it for in camera inspection on remand.

Plaintiffs additionally wish to have document Van Mersbergen 0266 submitted for inspection. The document is a letter from Dennis Van Gorp to Norman Van Mersbergen dated September 3, 2011. It was claimed as privileged in defendant's October 20, 2015 privilege log. In plaintiffs' fourth motion to compel, which was filed before discovery closed, plaintiffs allege they challenged the document, and it was never submitted to the court. On remand, defendant must submit the document for in camera review.

Finally, on March 16, 2016, defendants produced the minutes for a June 20, 2011 Board of Elders meeting. The minutes provided that Reverend Cammenga submitted an exit report, although the report was not attached to the produced minutes. On March 28, plaintiffs noticed this oversight and requested that defendant produce Reverend Cammenga's report. Defendant never produced the report. In their response to plaintiffs' fourth motion to compel, defendant attached

a copy of the report but redacted the entirety of the document except "Dear Dennis" and "With Christian Love, Pastor Cammenga." The district court then held that "the defendants have now produced that report per the plaintiffs' request and no ruling is necessary." However, because defendant failed to produce the report in a timely manner, plaintiffs were kept from challenging the claimed privilege and the document's wholesale redaction. Accordingly, on remand, defendant must submit the document for in camera inspection, and the court must determine if the entire report is privileged.

## IV. Conclusion.

Because we find the First Amendment does not bar negligent-supervision claims against religious entities, and Anne's claim is not time-barred, we reverse the judgment of the district court. We affirm the summary adjudication of plaintiffs' defamation claims. On remand, defendant must produce the identified documents for in camera inspection.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

All justices concur except Hecht, J., who takes no part.