# IN THE SUPREME COURT OF IOWA

No. 20–0236

Submitted March 24, 2021—Filed May 21, 2021

**RYAN KOSTER,**

    Appellant,

vs.

**HARVEST BIBLE CHAPEL–QUAD CITIES** d/b/a **HARVEST BIBLE CHAPEL–DAVENPORT** and **GARTH GLENN,**

    Appellees.

---

Appeal from the Iowa District Court for Scott County, Thomas G. Reidel and Mark R. Fowler, Judges.

A former member of a church appeals the district court's grant of summary judgment on his claims against the church and a pastor for breach of fiduciary duty and defamation. **AFFIRMED.**

Mansfield, J., delivered the opinion of the court, in which all participating justices joined. Waterman, J., took no part in the consideration or decision of the case.

Gary Dickey (argued) of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

Amanda M. Richards (argued) of Betty, Neuman & McMahon, P.L.C., Davenport, for appellees.

**MANSFIELD, Justice.**

We must examine again the uneasy relationship between law and religion. Two members of a church went through a fractious divorce. One member alleged that the other member had abused their children, allegations that turned out to be groundless. Their pastor, however, believed the allegations and sent emails to fellow pastors, church staff, and a discipleship group. The emails repeated the allegations to some extent, while also expressing support for the member making the allegations. After the allegations were discredited, the member who had been victimized by the allegations sued the pastor and the church on several tort theories. Relying on our precedents limiting judicial intervention in religious matters, the district court granted summary judgment. An appeal to this court followed.

On appeal, we conclude that summary judgment was proper. We find that the plaintiff's breach of fiduciary duty claim cannot go forward because it would require consideration of the church's doctrine and religious practices. We also find that the plaintiff's defamation claim is subject to a qualified privilege and that plaintiff has not overcome that privilege with evidence of actual malice. Therefore, we affirm the district court's judgment.

### I. Facts and Procedural History.

Plaintiff Ryan Koster (Ryan) is a former member of defendant Harvest Bible Chapel (HBC), a nondenominational Christian church located in Davenport. Ryan began attending HBC in 2005 and became a full member in 2007. From 2006 to 2015, Ryan served as a volunteer leader in the HBC High School Ministry. Through his involvement in HBC, Ryan met Lisa, who was also an active member in HBC, and the couple

married in 2007. The Kosters subsequently became parents to two children.

The Kosters regularly participated in an HBC activity known as Small Group, in which individuals discussed their lives and weekly scripture readings. The Kosters' Small Group was attended by ten couples, including defendant Garth Glenn and his wife Deanna. Glenn, a pastor at HBC, initially led their Small Group. HBC practices what it describes as Biblical Soul Care, "speaking the truth in love in your circle of influence." Small Groups are a part of this.

Ryan testified that their Small Group operated as follows:

> Generally, we would get together and meet, talk, socialize for a bit of time, maybe eat some food, and then we would gather in a room and either watch a video, do a study from the Bible, and then after a time, then the men would break out and go to our own area and the women would do the same.

Essentially the congregants of the church provided counsel to one another using a "counseling in community" approach. According to Ryan, there was no formal confidentiality agreement, but there was discussion "[t]hat it's a safe place to share and what's said there stays there."

The Kosters, the Glenns, and a third couple in the Small Group, the Martins, became close friends. They took vacations together.

In September 2013, both the Kosters and the Martins were experiencing greater difficulties in their marriages. Pastor Glenn invited them to join a new regular group consisting of just the three couples. The new group, "Life Group," met on a weekly basis. They had the same oral commitment that "what's said there stays there."

Life Group met over twenty times as a group of six, without men and women breaking off separately. Life Group practiced Biblical Soul Care, but more informally. The three couples would go around the room and

each couple would give an update on how things were going in their marriage and in their family. In these discussions, Ryan discussed frankly "all my sexual sin," such as viewing of pornography and masturbation. He also discussed problems with sexual intimacy.

On April 28, 2015, Lisa called Pastor Glenn and reported her young daughter was saying Ryan had touched her under her underwear. Lisa immediately sought a temporary protective order against Ryan. The court granted a protective order the next day. Lisa sent emails to HBC staff members about the alleged sex abuse. Lisa also discussed the allegations with members of the HBC congregation. At Lisa's urging, both the department of human services (DHS) and the police initiated investigations.

On April 29, Pastor Glenn sent an email to his fellow pastors and directors at HBC. It said in part,

> Not only are Ryan and Lisa Koster dear friends they have been our family for the past 9 years. Along with that we have walked with them in the realm of corrective counseling extensively and intensively specifically the past few years. Unfortunately, events transpired yesterday that initiated the necessity of police and DHS involvement. Lisa and the kids are safe but things are just now coming to a head.

Pastor Glenn's email went on to predict that Ryan "will attempt to reach out to whoever will give him an ear or be an ally" and to "ask that you do not allow him to serve in any capacity no matter how minimal it may be."

Pursuant to HBC protocol, the following day a "Security Alert" flyer with Ryan's photograph was posted in a locked closet at HBC accessible to HBC staff. It bore a picture of Ryan and stated that the "court finds that the Protected Party (Lisa Koster) and the children . . . are in danger of physical harm from Ryan Koster (husband & father)." It explained that

Ryan "cannot be on the premises at the same time as Lisa [or the children]. He cannot be in contact or pick up his children from church."

On May 3, Pastor Glenn sent a lengthier email to the members of the ten-couple Small Group. This email read as follows:

> Well—it is with a very heavy heart that I am needing to write this email to all of you. A[s] our former small group and partners in ministry I thought it best to do it this way so that you can discre[et]ly pass this information on to others who you think need to know. Please use much discretion.

> I also know that Ryan is reaching out and talking to different people (even some of you) and want to make sure that to [the] best I can I am able to inform you in order for you to be able to respond appropriately.

> Things are very much in flux and change from day to day and will probably get worse before hopefully it gets better. I do ask for grace as this is certainly something that I haven't dealt with before and don't know the best way to go about informing (and what to say) to those closes[t] to the Koster's. Quite simply my focus hasn't been making sure everyone is in the loop but that Lisa and the kids are being cared for and are safe. Don't take that personally but during these times some of the fallout and mess is people not knowing the full story and details. I am sorry but out of deference for Ryan/Lisa and the kids it's tough to know what to share.

> Ryan and Lisa are not only friends first but family. With that said, also remember that we have journeyed with them for at least 2.5 years with one on one corrective care. There have been good times and really rough times. But in the past 3 months things got to a point that intensive counseling was absolutely necessary (12 Stones) and we were to begin it a week from today. Unfortunately, we had to pull the plug out of fear of authorities getting involved due to the fact that 12 [S]tones is a mandatory reporter of child abuse (in this case physical abuse with [the son]) if it came up in counseling as it was included in Lisa's application. We believe not going was best for . . . Ryan and Lisa and the kids and did not believe at that time the kids were in immediate danger and since the information came out to me in an informal setting of a home I was not a mandatory reporter. We have attempted—and exhaustively so—to deal with all issues that are currently active in their marriage. We have always strived to do so biblically, fairly and with grace. We have rebuked, corrected, exhorted, encouraged, loved and cried privately and corporately. It has been the hardest thing we have ever been

a part of. This is not an issue of choosing sides but fighting for their marriage, their family and ultimately now allowing the legal system to take its course.

As it stands there is currently an order of protection against Ryan until at least Wed. 5/13 when there will be a hearing. This came about from events that transpired last week (Tuesday 4/28 specifically) that forced Lisa to take action and get authorities involved (DHS and police)—which meant filing for the protection order and removing Ryan from the house. He was served with this order on Thursday afternoon. It must be said that this is no longer about habitual sins in the life of Ryan but has entered into a far more serious level of allegations. I hesitate to share specifically but the allegations are generally explained in the order and came from what [their daughter] shared with Lisa. And even as recent as yesterday (Saturday) there is more information coming to light and being shared by her. I trust you can connect the dots and realize that what we are talking about are horrific allegations and are tough to even discuss openly.

Ryan is denying the allegations and believes his 3 yr. old daughter is outright lying (I specifically asked him). But regardless of what he says the allegations are serious enough that I would counsel you not have Ryan stay in any of your homes if he asks to do so especially if you have children. I have told him this and also told him I would tell others not to allow him to do so.

Let me address what may be a thought for some of you especially if you have spoken to Ryan personally. Lisa is not on a witch hunt and looking to destroy Ryan. Just the opposite: she has worked tirelessly to address major issues in her marriage literally to some degree for the entirety of almost 8 years of marriage and believes that God is capable of doing a miracle in Ryan's life as well as their family. But her hand was forced to protect her kids and . . . herself and for that she makes no apologies and we support her wholeheartedly. We have not pushed for divorce but instead separation for reconciliation has been the primary focus—Ryan even agreed with this at one point. But even that has been taken out of our hands and divorce at this point seems inevitable.

Ryan is in a bad spot. My hope is we will have the chance to re-engage him in the process of one on one discipleship. Unfortunately, the time for that is not now and we need to let things run its course and see what happens. I am not saying don't talk to him but use discretion and remember there is always more to the story and you don't know everything—even if he tells you that he has told you everything.

Pray. Pray. Pray. This is so surreal and unbelievable.

Lisa appreciates your texts and care but for now pray for her and tell her that you are doing so. She's just trying [to] figure out what the new norm will look like for her now.

On May 12, Pastor Glenn sent a similar email to HBC staff that omitted some of the details from the May 3 email.

Following an investigation, DHS did not conclude that the child sexual abuse allegations were founded. In September 2015, Lisa filed a second report of child sexual abuse which DHS likewise investigated and was unable to substantiate. In January 2016, Lisa filed a third report of child sexual abuse which DHS investigated and was unable to substantiate. Law enforcement also declined to pursue criminal charges against Ryan. In addition, on September 14, 2016, Lisa and Ryan's divorce was finalized with the court awarding physical care of the children to Ryan. The court presiding over the divorce proceeding determined that Lisa lacked credibility.

On April 17, 2017, Ryan filed suit in the Scott County District Court against HBC, Pastor Glenn, and two other pastors at HBC.[1] Count I, breach of fiduciary duty, alleged that the defendants had a fiduciary relationship with Ryan and "each failed to exercise the duties of that fiduciary relationship with the care an ordinary prudent person in a like position would exercise under similar circumstances and in a manner reasonably believed to be in the best interests of [Koster]." Count II alleged invasion of privacy, including both "false light" publicity and the public disclosure of private facts "offensive to a reasonable person of ordinary sensibilities." Ryan went on to allege that the information disclosed "was not newsworthy or otherwise a matter of public concern." Count III alleged

---

[1]Subsequently, Ryan voluntarily dismissed the other two pastors from the case.

defamation, count IV alleged vicarious liability, and count V alleged conspiracy.[2]

On April 12, 2018, the defendants filed their first motion for summary judgment. The motion asserted that under the undisputed facts, Pastor Glenn did not owe a fiduciary duty. Alternatively, if he owed such a duty, it was intertwined with church teachings and doctrine rather than based purely on secular law. A fiduciary duty of this type, according to the defendants, could not be the subject of a court action in light of the First Amendment. As to counts II and III, the defendants maintained that there had been no invasion of privacy or defamation or, alternatively, that any complained-of statements were privileged. Ryan resisted the motion, and the court held a hearing.

On September 27, the district court issued a ruling on the defendants' first summary judgment motion. As to breach of fiduciary duty, the court granted the defendants' motion in part and denied it in part. To the extent the alleged duty was one of good faith, reasonable care, loyalty, or impartiality, the court found that such a duty was tied to religious teaching and church doctrine and could not be judicially enforced. However, the court allowed the breach of fiduciary duty claim based on breach of an express promise of confidentiality to go forward, reasoning that it was founded in "neutral" principles of law.

The court's ruling also concluded that Ryan's invasion of privacy claim could not survive summary judgment for two reasons. First, the emails had been disseminated only to HBC staff and Small Group members. Therefore, the required publicity element had not been met. Second, in the court's view, Pastor Glenn had a qualified privilege to notify

---

[2]Ryan later dismissed count V voluntarily.

HBC staff and Small Group members in good faith of the order of protection and the serious allegations of abuse. The court pointed out that there were no facts suggesting Glenn "knew that the allegations were false or recklessly disregarded the truth." Relying on the same qualified privilege, the court also granted summary judgment to the defendants on the defamation claim.

About two months later, the defendants moved for summary judgment on the issue of whether Ryan could recover punitive damages. This motion was denied.

Finally, as trial approached, the defendants filed a third motion for summary judgment. This motion targeted what was left of Ryan's breach of fiduciary duty claim, namely the alleged breach of confidentiality. The defendants argued that Pastor Glenn's disclosures did not actually violate a specific agreement between Glenn and Ryan; therefore, to decide this claim would require examination of HBC's tenets and practices and contravene First Amendment principles.

The district court granted this motion on December 21, 2019, finding that Pastor Glenn's communications were subject to a "qualified privilege" because they were "made in furtherance of the HBC's congregation's common interest." The court denied Ryan's motion for reconsideration on February 3, 2020.

Ryan appealed the dismissal of the breach of fiduciary duty and defamation claims, and we retained the appeal.

## II. Standard of Review.

We review a district court's summary judgment ruling for correction of errors at law. *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 36 (Iowa 2018). Summary judgment is proper

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Iowa R. Civ. P. 1.981(3). We view the record in the light most favorable to the nonmoving party. *Bandstra*, 913 N.W.2d at 36.

### III. Legal Analysis.

**A. Breach of Fiduciary Duty.** Ryan alleges that Pastor Glenn violated a fiduciary duty. Specifically, in his petition, Ryan alleges that Glenn failed to act "with the care an ordinary prudent person in a like position would exercise under similar circumstances and in a manner believed to be in the best interests of [Koster]." Ryan concedes that "Glenn's status as a pastor is an important fact" in the fiduciary relationship analysis, but "not the *sine qua non*."

"[T]he general rule [is] that religious controversies are not the proper subject of civil court inquiry." *Serbian E. Orthodox Diocese for the U.S. & Can. v. Milivojevich*, 426 U.S. 696, 713, 96 S. Ct. 2372, 2382 (1976). Three years ago, in *Bandstra v. Covenant Reformed Church*, we considered whether certain tort claims could be brought by parishioners against their church consistent with the First Amendment. 913 N.W.2d at 30. Two women had been victimized by a church pastor who sexually exploited them under the guise of counseling. *Id.* at 30–32. When the pastor's misconduct came to light, various church elders put forth a series of communications characterizing the women as sinners and blaming them as coperpetrators. *Id.* at 33. The women and their spouses sued the church and several named elders, alleging the defendants had negligently disregarded the advice of professional counselors and ignored any duty of care they owed to the plaintiffs. *Id.* at 34, 41.

We upheld the grant of summary judgment in favor of the defendants on these claims of "[n]egligent response to sexual abuse allegations." *Id.* at 41. We explained our reasoning as follows:

> The means by which [the elders] chose to counsel and advise the congregation is outside the purview of the government. Plaintiffs argue "a reasonable church would seek assistance for parishioners and not label victims 'adulteresses.'" Yet, that is precisely the type of determination that the Religion Clauses prohibit. The elders determined that certain speakers and mental health resources were outside of their faith. A court cannot dictate what teachings and services a church offers its parishioners. Nor can we disapprove of the elders deciding, pursuant to their duty as religious authorities, that the women would be best healed by simply confessing their "sins." Because plaintiffs' first two negligence claims go to the very heart of religious decision-making, they are barred by the First Amendment.

*Id.*

This case, like *Bandstra*, essentially involves an allegation that a church bungled a response to a disturbing episode, thereby causing significant emotional harm to a parishioner. The fact that the legal theory is breach of fiduciary duty rather than negligence should not drive the First Amendment analysis. The issue, rather, is whether we can say "the purportedly tortious conduct was not grounded in any religious belief or practice," or to put it another way, whether the liability determination "would treat religious and nonreligious entities equally." *Id.* at 40.

Ryan argues that Pastor Glenn breached a duty of confidentiality—a neutral duty that does not require consideration of religious belief or practice. We are not persuaded, though, that the alleged duty can be neatly separated from HBC's teachings and practices. We begin with three undisputed points. First, Lisa herself disclosed the alleged abuse of her

daughter to the HBC congregation and staff.[3] Second, Glenn's communications went only to Small Group members and HBC staff. Third, with one exception that can be discounted, Glenn's communications didn't disclose anything specific that Ryan had revealed in the group sessions, such as the viewing of pornography or masturbation.[4]

Instead, Ryan's complaints center on Pastor Glenn's *characterizations* of those sessions: for example, that Ryan "needed intensive help," that Ryan's life has "habitual sins," that dealing with the issues in Ryan's marriage "has been the hardest thing we have ever been a part of." Ryan also complains that Glenn accepted Lisa's version of the alleged abuse and expressed the view that Ryan was not telling the truth.

Deciding that these acts breached a fiduciary duty would require us first to determine what fiduciary duties Pastor Glenn owed to Ryan. As the Restatement tells us,

> A fiduciary will have specific obligations that vary from one circumstance to the next, but also general responsibilities that are common to all settings. A fiduciary owes a duty of undivided loyalty to the beneficiary of the relationship. A fiduciary is obliged to avoid self-dealing and conflicts of interest and to deal honestly with the beneficiary, and it is generally improper for a fiduciary to profit from a fiduciary relationship without the consent of the other party to it. The details of these principles depend, however, on the precise relationship between the parties and on the surrounding law.

Restatement (Third) of Torts: Liab. for Econ. Harm § 16, at 123 (Am. L. Inst. 2020). This is not a case about whether Glenn breached a duty

---

[3]Ryan testified in deposition that Lisa told people publicly about Ryan's alleged sexual abuse of their daughter.

[4]Ryan asserts that Pastor Glenn told one Small Group member about Ryan's pornography use, but that member testified he had already received the same information from Ryan. That member admitted in deposition that Glenn didn't tell him anything he didn't already know.

"common to all settings" such as the "duty of undivided loyalty." *Id.* Glenn could not have had a duty of undivided loyalty to Ryan; Lisa belonged to the same groups. Rather, this case involves a case-specific duty of confidentiality. The question, then, boils down to whether the confidentiality duty can be defined by some neutral source or requires reference to church doctrine and practices.

Ryan points to three sources for the confidentiality duty. One is Iowa Code section 622.10(1) (2017), which clearly does not apply here because the conversations occurred in a group setting. The second is the verbal understanding that what was said in the groups would stay in the groups. The third is a provision in the HBC by-laws that members would "neither gossip nor listen to gossip concerning any member." In effect, Ryan argues that the second and third commitments imposed a legal duty on Pastor Glenn as group leader not to share anything about Ryan with the members of the groups and with church staff if Glenn's views were derived at all from group sessions. But the second and third commitments were far from specific. We see no way for a court to interpret the scope of these vague promises, and how they apply to Glenn's internal communications with group members and staff, without immersing itself in HBC customs, practices, and doctrine. Ryan argues that "Glenn's fiduciary relationship with Ryan does not turn solely upon his status as a pastor." But that's the point: it turns *partly* on his status as a pastor.

Ryan directs us to four out-of-state cases recognizing breach of fiduciary duty claims against clergy. In *Vione v. Tewell* a parishioner was allowed to sue a minister for breach of fiduciary duty. 820 N.Y.S.2d 682, 686–87 (Sup. Ct. 2006). While purporting to offer marriage counseling to the plaintiff and his spouse, the minister actually engaged in a sexual relationship with the spouse, "deceiving plaintiff and undermining his

marriage, while continuing to act as his marriage counselor." *Id.* In *Doe v. Evans*, the plaintiff was permitted to pursue a claim for breach of fiduciary duty where a clergy member who abused a marital counseling relationship with her to engage in an inappropriate sexual relationship. 814 So.2d 370, 375 (Fla. 2002). The court emphasized that "Doe's breach of fiduciary duty claim is governed by neutral tort law principles of general application" and does not require interpretation of "ecclesiastical doctrine." *Id.* at 376. In *Destafano v. Grabrian*, like *Doe*, the claim was that a clergy member who was supposed to be providing marital counseling to a couple instead had a sexual relationship with one member of the couple. 763 P.2d 275, 277 (Colo. 1988) (en banc). Lastly, in *Doe v. Liberatore,* the court authorized a parishioner who had been sexually abused as a teenager by a parish priest to bring a breach of fiduciary duty claim. 478 F. Supp. 2d 742, 772–73 (M.D. Pa. 2007). Again, given these circumstances, the court observed that "[n]o inquiry need be made into church doctrine or other ecclesiastical matters" and "[n]o professional standard of care need be set for clergy." *Id.* at 772.

The outcomes in those cases make sense. The legal norms that were violated in those cases are neutral ones that do not derive from a particular religious institution's practices. The principles that a marriage counselor should not be engaged in a sexual relationship with a counselee and that a priest should not be making sexual advances toward a minor whom he is supervising are universal. They do not require any consideration of a church's teachings, rules, or standards.

The defendants, meanwhile, call our attention to *Westbrook v. Penley*, a case we find more on point than Ryan's authorities. 231 S.W.3d 389 (Tex. 2007). There a church member confided to her pastor that she had engaged in an extramarital relationship, which led the pastor to send

a letter to the congregation disclosing that the member "intended to divorce her husband, there was no biblical basis for the divorce, she had engaged in a 'biblically inappropriate' relationship with another man, and she had rejected efforts to bring her to repentance and reconciliation." *Id.* at 393. The member sued for defamation, negligence, breach of fiduciary duty, and intentional infliction of emotional distress. *Id.* at 394.

To overcome a First Amendment defense, the member argued that "her suit center[ed] on [the pastor's] initial disclosure to the church elders of confidential information obtained during the marital counseling sessions, which she claim[ed] constituted a breach of professional counseling standards." *Id.* at 400. However, the Texas Supreme Court concluded that "this disclosure cannot be isolated from the church-disciplinary process in which it occurred, nor can [the pastor's] free-exercise challenge be answered without examining what effect the imposition of damages would have on the inherently religious function of church discipline." *Id.* The court emphasized that "clearly [the pastor's] actions were grounded in religious doctrine." *Id.* at 404. Accordingly, it upheld the dismissal of the case. *Id.* at 405.

We think *Westbrook* has lessons for the present case. Here, too, Pastor Glenn's actions "cannot be isolated from" the HBC environment in which they occurred. This is not a case where Glenn's liability can be determined solely by reference to a straightforward, nonreligious standard. No written contract or criminal statute, for example, serves as the basis for liability. Rather, we are dealing with the fluid tort of breach of fiduciary duty. A number of religious considerations affect the scope of that duty,

including the roles and responsibilities of pastors, groups, and members at HBC.[5]

Ryan argues that *Westbrook* is distinguishable because it did not follow the "neutral principles" approach we endorsed in *Bandstra*. To the contrary, we think it did. The Texas Supreme Court acknowledged that "Penley pins Westbrook's liability in this case, at least in part, on his breach of a secular duty by disclosing Penley's confidential information to the church elders in the first instance." *Id.* at 400. Yet, as noted above, the court went on, stating that "this disclosure cannot be isolated from the church-disciplinary process in which it occurred." *Id.*

In short, deciding liability here would not be a simple task of applying a well-defined secular standard but would involve weighing of both marital counseling standards and the norms by which the church is governed. As in *Bandstra*, we believe "[t]he means by which [the church official] chose to counsel and advise the congregation is outside the purview of the government." *Bandstra*, 913 N.W.2d at 41.

Because determining whether Pastor Glenn, and derivatively HBC, breached a fiduciary duty of confidentiality to Ryan arising out of group discipleship discussions would require our courts to interpret HBC doctrine and practices, such a claim cannot proceed in our courts. Summary judgment was properly granted.

---

[5]The defendants cite other authority that we also find relevant. In *Lightman v. Flaum*, New York's highest court held that two rabbis could not be sued for breach of fiduciary duty for violating the statutory clergy-penitent privilege. 761 N.E.2d 1027, 1033 (N.Y. 2001). The rabbis argued that they had doctrinal reasons for disclosing the information that had been revealed to them in confidence. The court found that these reasons were not subject to court oversight: "[T]he prospect of conducting a trial to determine whether a cleric's disclosure is in accord with religious tenets has troubling constitutional implications." *Id.* The court concluded that summary judgment for the defendants was appropriate, even while acknowledging that the "plaintiff understandably resents the disclosure of intimate information she claims she revealed to defendants in their role as spiritual counselors." *Id.*

**B. Defamation.** Ryan also asks us to reverse the dismissal of his defamation claim. Ryan alleges that Pastor Glenn's emails expressly or impliedly stated that Ryan had abused his children. Those statements were false and, in Ryan's view, he was entitled to a jury trial on defamation.

Pastor Glenn responds that a qualified privilege applies. In *Kliebenstein v. Iowa Conference of United Methodist Church*, we considered a defamation claim brought by a church member against a church and church officials. 663 N.W.2d 404, 405–06 (Iowa 2003). The officials had sent out a letter referring to the church member as having "the spirit of Satan." *Id.* at 405. We said that the claim would not "enjoy viability had the matter been divulged solely to the members of [the church]." *Id.* at 406. We quoted a treatise for the following "general rule":

> [T]he common interest of members of religious associations is such as to afford the protection of qualified privilege to communications between them in furtherance of their common purpose or interest. Thus, communications between members of a religious organization concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged.

*Id.* at 406–07 (quoting 50 Am. Jur. 2d *Libel and Slander* § 340, at 663 (1995)). We held, however, that the qualified privilege was not available because "publication of the letter was not limited to a 'religious community or body' "; rather, the letter had been "mailed not only to members of the congregation but also to other persons living in the Shell Rock community." *Id.* at 405, 407. After deciding also that "spirit of Satan" had a secular meaning when used outside a church, we reversed the summary judgment in favor of the defendants and remanded for further proceedings. *Id.* at 408.[6] Here, upon analyzing *Kliebenstein*, the district court

---

concluded that a qualified privilege existed, a determination that Ryan contests on appeal.

It is undisputed that on April 28, 2015, Lisa took both children to the hospital and involved the police and DHS to report that Ryan had sexually abused their daughter. Lisa then successfully obtained a no-contact order on April 29. Ryan does not deny that he was still a member of HBC at the time Pastor Glenn sent the emails in question.

Also, in the proceedings below, Ryan did not dispute that Pastor Glenn honestly believed Lisa's version of events as of spring 2015. Nor did Ryan argue that Glenn acted out of a reckless disregard for the truth.

Instead, Ryan opposes the application of qualified privilege on two grounds. First, he maintains that Pastor Glenn lacked a legitimate reason for informing the Small Group and HBC staff of his supposed abuse of the children. Second, he argues that any qualified privilege was lost, as in *Kliebenstein*, when Ryan sent the May 3 email to a nonmember of the church. One of the recipients of that email was Jim Demarest, who by then had ceased to be a member of HBC.

We will begin by addressing Ryan's first contention. Pastor Glenn's communications went out from his official HBC email address and under his official HBC email tagline as "Family Pastor." Glenn sent the April 29

church that 'the [p]laintiff was a homosexual,' and that 'the [p]laintiff disrespected the church by viewing gay pornography on the church's computer.' " *Id.* at 126 (alterations in original). The complaint further alleged that the pastor "stated that he would make false statements against the plaintiff" so the church membership would vote to relieve the plaintiff of his responsibilities. *Id.* at 128. Accepting these allegations as true, the court found that the defamation claim was based on neutral principles and sufficiently alleged malice to overcome the common-interest qualified privilege. *Id.* at 127–28; *see also Ex parte Bole*, 103 So. 3d 40, 60 (Ala. 2012) ("[A] church or other religious organization ordinarily bears no tort liability for statements by or between church officers or members concerning the conduct of other officers or members, because 'communications between members of a religious organization concerning the conduct of other members or officers in their capacity as such are qualifiedly privileged' as matters affecting a common interest or purpose." (quoting 50 Am. Jur. 2d, *Libel and Slander* § 340)).

email to fellow pastors and directors "to keep them informed of the situation and gain their spiritual insight and discernment." Glenn sent the May 3 email to the Small Group that had been "personally connected and involved in the Koster marriage . . . as part of [the] customary practice of discipleship to provide these individuals who were discipling Ryan and Lisa Koster with information so they could wisely and effectively respond to the situation and squash any gossip." Glenn sent the May 12 email to keep the staff informed about the situation since they were being asked questions.

These specific facts, which are not challenged by Ryan, are sufficient to establish that a qualified privilege applies. Glenn was communicating with staff and members on a matter of common interest. Moreover, if we were to second-guess whether the Small Group had a legitimate need to know about the child abuse allegedly committed by a fellow member of that discipleship group, we would be delving into the doctrine and practices of HBC and thus intruding into forbidden First Amendment territory.

"Qualified privilege may be lost, however, if the speaker abuses the privilege by speaking with actual malice or excessively publishing the statement 'beyond the group interest.' " *Bandstra,* 913 N.W.2d at 48 (quoting *Kliebenstein,* 663 N.W.2d at 407). "In the clergy context, a statement loses its privilege if made to individuals outside the congregation." *Id.* Does it make a difference that Pastor Glenn sent his May 3 email to Demarest?

The defendants say no, and the district court agreed. Demarest was no longer a member of HBC, but he was not a stranger. Glenn attested there was no requirement that someone be a member of the church in order to participate in HBC small groups. Demarest had remained

involved with the discipleship group for Ryan. He had been checking in by email with Ryan monthly for continued discipleship with the men in Small Group.[7]

Moreover, Demarest's responses to the May 3 email show that he had a common interest in the matter. In his first email Demarest said, "I'm heart-broken for you and the Kosters." In a later communication, he added that Ryan had been contacting him. He indicated that his spouse and Lisa were close, and he asked whether he should be concerned about the safety of his girls since they spent time with Koster children (and were attending a baseball game with them). His second email concluded, "I continue to pray for you and the Kosters!"

Under these circumstances, we find as a matter of law that Demarest retained a common interest in the subject matter of Pastor Glenn's communications. The qualified privilege for communications by religious organizations is essentially a variant of the common-interest privilege. *See Kliebenstein*, 663 N.W.2d at 406–07. Therefore, Demarest's receipt of the May 3 email did not destroy the qualified privilege. *See, e.g.*, *Theisen v. Covenant Med. Ctr., Inc.*, 636 N.W.2d 74, 84 (Iowa 2001) ("The privilege may be lost, however, if the speaker acts with actual malice, or exceeds or abuses the privilege through, for example, excessive publication or through publication to persons other than those who have a legitimate interest in the subject of the statements."). Again, no one other than Small Group members and HBC staff received Glenn's emails.

In sum, Pastor Glenn's emails, whatever their flaws, were sent by a religious leader exclusively to staff and members of that religious

---

[7]On appeal, Ryan contends that some of these facts were not properly established for summary judgment purposes because they were based on hearsay in Pastor Glenn's affidavit. *See* Iowa R. Civ. P. 1.981(5). However, Ryan raised no such objection below.

community, plus one person who retained genuine ties to that religious community. The emails were in furtherance of their common purposes. We conclude that a qualified privilege applies. Given the lack of evidence of malice, summary judgment on the defamation claim was warranted.

### IV. Conclusion.

For the foregoing reasons, we affirm the district court's grant of summary judgment to the defendants.

**AFFIRMED.**

All justices concur except Waterman, J., who takes no part.