# IN THE COURT OF APPEALS OF IOWA

No. 20-0296
Filed October 6, 2021

**CAPITAL IDEAS, LLC,**
Plaintiff-Appellant/Cross-Appellee,

**vs.**

**SPRINGBOARD ADVERTISING LLC and CHRISTINA AMYS,**
Defendants-Appellees/Cross-Appellants.
_____

**SPRINGBOARD ADVERTISING LLC and CHRISTINA AMYS,**
Counterclaim Plaintiffs,

**vs.**

**CAPITAL IDEAS, LLC and MICHAEL WOODY,**
Counterclaim Defendants-Appellants/Cross-Appellees.
_____

Appeal from the Iowa District Court for Polk County, David Nelmark, Judge.

Capital Ideas, LLC and Michael Woody appeal a money judgment in favor of Springboard Advertising LLC and Christina Amys. Springboard and Amys cross appeal. **REVERSED AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

Jeffrey R. Kappelman, Erik P. Bergeland, and Andrew T. Patton of The Finley Law Firm, P.C., Des Moines, for appellant.

Brenda L. Myers-Maas of Myers Mass Law, PLC, West Des Moines, for appellees.

Heard by Mullins, P.J., and May and Ahlers, JJ.

**MAY, Judge.**

A jury awarded $220,000 in damages to Springboard Advertising LLC (Springboard) and Christina Amys on their claim[1] of defamation per se against Capital Ideas, LLC (Capital) and Michael Woody. Capital and Woody appeal from the resulting judgment. Springboard and Amys cross-appeal. They argue the district court erred in rejecting some other defamation claims.

We conclude Capital and Woody were entitled to judgment notwithstanding the verdict (JNOV) on the claim of defamation per se. As to that claim, we reverse and remand for dismissal. As to all other issues, we affirm.

## I. Factual Background

Amys and Woody are advertising professionals. Amys's business is called Springboard Advertising, LLC. Woody's business is called Capital Ideas, LLC.

In 2010, Woody and Amys decided their companies should cooperate. Each company brought its clients to the joint effort. They worked together under Capital Ideas's flag.

For years, this arrangement worked well. But in early 2017, the story started to arc. Woody allegedly fired a major client without obtaining Amys's consent. Amys felt there were other problems, too, like Woody "micromanaging" her.

In June, Amys told Woody it was time for her to leave. Amys later testified about what she said:

> I told him that I needed a more flexible schedule. I told him that I didn't want 30-plus accounts, which is what he wanted. We

---

[1] The defamation per se claim was technically a counterclaim. Because this distinction makes no difference to our analysis, we sometimes use claim to refer to counterclaims as well as claims.

were spinning our wheels with 30-plus accounts. I was working all the time.

Clients were firing us. He was firing clients. It was madness. I did not—I said, We can't even handle the accounts we have. Why would we have 30-plus more accounts? I did say that we are in different stages of our lives and, because of all these hours that I'm working trying to juggle all of accounts, I am missing out on my kids' lives and didn't want to do it anymore. So I said it is time for me to go back to Springboard Advertising.

So Amys and Woody began working on the terms of their dissolution. There has been some dispute about what they agreed on. For example, while Woody has claimed they agreed that Amys would not solicit certain clients, Amys vehemently denies that claim.

But it seems undisputed they agreed Woody would (as he ultimately did) email this message to all of their clients:

After six and a half great years, [Amys] and I have decided to end our partnership. Effective mid-July, [Amys] will go back to focusing on her original advertising agency, Springboard Advertising, and I will continue supporting clients for Capital Ideas.

The split has been very amicable and we will remain good friends and maybe even collaborate on a few customer projects down the road. [Amys] has retained the clients that she brought to our agency from Springboard Advertising, plus a few others. I will very much miss working directly with those clients but I know they are in great hands and I am certain that they will continue to see huge results and grow under [Amys's] direct supervision.

Please join me in wishing [Amys] well as she heads back into the world of sole agency ownership!

Capital Ideas will continue to operate as usual and we are already on our way to arranging for a new bookkeeper to help pick up a portion of [Amys's] duties. I will be in touch with all of you in the next few weeks as Capital Ideas will continue to offer the service and experience you've come to expect.

In private, though, Woody also told clients some other information about Amys's reasons for leaving. He said so in this interrogatory answer:

**Interrogatory No. 20:** Set forth all communications, whether verbal, written, or electronic, you have had with any third party (other

> than privileged attorney client communications) regarding your separation from Christina Amys/Springboard Advertising.
>
> **Answer:** I sent an email to the Des Moines Register to see if my representative was going to honor the agency/media client confidentiality agreement. I suspected she was not. I was correct. **Any other information I shared about Chris is that she did not want to work this hard, wanted less accounts and stress and was planning to spend much more time with her kids.** All of those items she told me were her reasons for leaving and shared many times with reps and clients in my presence. In conversations with clients and reps, I told them how happy I was for her to be able to take this time to spend with her family.

(Emphasis added.)

Woody also made some other statements to Kelly Brown, the local sales manager for KCCI television. According to Brown's testimony, Woody told her that Amys had failed to honor their agreement about "whose clients would be whose," and that "his trust of [Amys] was broken." After this conversation, Woody sent Brown an email entitled "sorry to unload on you . . ." In its body, the email stated: "It has been a really bad two weeks as I find that the person I trusted with the finances of my company has no ethics. I am so disappointed in her." Brown knew the email was about Amys.

In January 2018, Capital began this litigation against Springboard and Amys. Capital pled claims for breach of contract and interference with business relationships. The gist of the suit was that Amys was wrongfully soliciting Capital's clients.

Springboard and Amys answered and raised affirmative defenses. They also brought counterclaims for interference with business relationships, unfair competition, and defamation.

As trial approached, the issues narrowed. At summary judgment, the court dismissed all of the interference-with-business-relationship claims. The court also provided pre-trial rulings on whether certain statements by Woody were actionable as defamation per se, defamation per quod, or not at all. Two of those rulings are important here. First, the court ruled that one of Woody's statements was defamation per se. The statement was this: "[Amys] does not want to work this hard, wanted less accounts and stress and was planning to spend much more time with her kids."

The court also ruled on Woody's statement to Brown that "I find the person I trusted with the finances of my company has no ethics." The court concluded this statement was not actionable because "[t]he assertion that someone has 'no ethics' is a subjective opinion rather than a verifiable statement of fact."[2]

Jurors heard evidence over four days. Ultimately, the jury rejected most of the parties' claims. Important to this appeal, though, the jury found for Amys and Springboard on their defamation per se claim. On this claim, the jury awarded $110,000 in actual damages plus $110,000 in punitive damages.

Post-trial motions followed. The district court declined to grant a new trial or otherwise disturb the defamation-per-se verdict. Instead, the court entered judgment for $220,000. Capital and Woody appealed. Springboard and Amys cross-appealed.

---

[2] As will be discussed further, however, the court submitted—as defamation per quod—Amys's claim that Woody defamed her "by making the statement that Amys was violating the separation agreement between Capital Ideas, LLC and Springboard Advertising, LLC." The jury rejected this claim.

## II. Analysis

### A.     The JNOV ruling

As noted, the jury awarded $220,000 on Springboard and Amys's claim of defamation per se.  One of the central issues in this appeal is whether— notwithstanding the verdict—Capital and Woody were entitled to dismissal of this claim.  We conclude they were.  *See Van Sickle Const. Co. v. Wachovia Com. Mortg., Inc.,* 783 N.W.2d 684, 687 (Iowa 2010) ("We review the denial of a motion for judgment notwithstanding the verdict for correction of errors at law.").

"Defamation is an invasion of the interest in reputation and good name." *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996).  Ordinarily, defamation requires proof of "the following elements: (1) publication, (2) of a defamatory statement, (3) which was false and (4) malicious, (5) made of and concerning the plaintiff, (6) which caused injury."  *Bierman v. Weier*, 826 N.W.2d 436, 443 (Iowa 2013).  But if a statement is classified as defamation per se, "the elements of falsity, malice, and injury are legally presumed and the statement is actionable without proof of the same."  *Bandstra v. Covenant Reformed Church*, 913 N.W.2d 19, 46– 47 (Iowa 2018).  So defamation per se only requires proof of "three elements: (1) publication, (2) a defamatory per se statement, and (3) the statement was of or about" the plaintiff.  *Duyvejonck v. Clydesdale*, No. 19-1408, 2020 WL 3265024, at *3 (Iowa Ct. App. June 17, 2020).

But not every troubling statement is defamation per se.  To qualify, a statement must have "a 'natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse.'"  *Bandstra*, 913 N.W.2d at 46 (citation

omitted).  The words used must be "of such a nature, whether true or not, that the court can presume *as a matter of law* that their publication will have" a defamatory effect.  *Vinson v. Linn-Mar Cmty. Sch. Dist.*, 360 N.W.2d 108, 116 (Iowa 1984) (emphasis added).

By way of example, our supreme court has "found defamation per se in statements accusing an individual of being a liar, accusing an individual of an indictable crime of moral turpitude or that carries a jail sentence, and accusing an individual of falsifying information."  *Bandstra*, 913 N.W.2d at 47 (internal citations omitted).  Derogatory statements "with reference to another in regard to [their] competency or fitness for his trade or profession" can also qualify as defamation per se.  *Vial v. Larson*, 109 N.W. 1007, 1007 (Iowa 1906).  Here, the district court concluded Woody's statement that Amys "does not want to work this hard, wanted less accounts and stress and was planning to spend much more time with her kids" was this kind of defamation per se.

But even statements about a professional's competency are "not defamatory per se if [they are] susceptible to two reasonable constructions or meanings, one not defamatory."  *Kerndt v. Rolling Hills Nat. Bank*, 558 N.W.2d 410, 418 (Iowa 1997) (analyzing statements that a bank president was experiencing mental-health problems and "nobody trusted" him).  As Black's Law Dictionary puts it, a statement can be defamation per se only if it is "*not capable* of an innocent meaning."  *Defamation*, Black's Law Dictionary (11th ed. 2019) (emphasis added).

So, a key question here is whether Woody's statement that Amys "does not want to work this hard, wanted less accounts and stress and was planning to spend

much more time with her kids" can be understood to have a meaning that is "innocent," that is, "not defamatory." If it can, it was not defamation per se.

In their briefing, Amys and Springboard put great emphasis on the words "work this hard." So, for purposes of analysis, we divide Woody's statement in two portions: (1) the statement that Amys "does not want to work this hard"; and (2) the statement that Amys "wanted less accounts and stress and was planning to spend much more time with her kids." This second portion, we believe, does not approach defamation *per se*. Perhaps there is some "reasonable[ ] construction or meaning[ ]" for these words that could be considered defamatory. *See Kerndt*, 558 N.W.2d at 418. But there are also reasonable, non-defamatory constructions. For example, these words can be understood to mean that Amys—like many people—simply wanted to adjust her work-life balance. Moreover, as will be discussed further, Amys's plan to concentrate her efforts on "fewer accounts" can be seen as a reasonable business strategy. Because Woody's words are "capable" of these "innocent" meanings, they are not defamation per se.

Now we reach the real object of conflict, Woody's statement that Amys "does not want to work this hard." As to these words, Amys articulates a plausible interpretation that smacks of defamation, namely, that Amys is not a hard worker. As Woody points out, however, there is also a reasonable non-defamatory interpretation. The phrase "*this* hard" could be understood as a *relative* statement. It could refer to Amys's choice to pursue a business model that differed from Woody's vision: while Woody hoped their joint operations would "grow to 30-plus clients," Amys believed Woody's high-volume approach was impracticable and—in any event—*not better than* having "closer relationships" with "a more

manageable number" of clients. Amys said so to one of her clients. Here is an excerpt from Amys testimony:

> Q. And what did you tell [the client about your reasons for leaving]? A. I told [the client] I needed a more flexible schedule, which automatically means more time with my family, and that I—we were talking about expanding to 30-plus clients. And so I told her that **I wasn't interested in having that many clients to juggle**, that **I just needed a more manageable number of accounts that I could have closer relationships with.** And I'm not sure if those were the exact words that I told [her], but she was curious why I was leaving.
> Q. Why would it be different to expand to 30 clients? A. Well, we were already spinning our wheels as it was, and Mike was firing clients, clients were firing us, and he was having a hard time managing the 28 clients that we currently had, and I—**it would have meant more work for me. He wanted to grow to 30-plus clients, and, ultimately, the majority of the work would come on me . . . . And I just—I wasn't interested in taking on even more work.**

(Emphasis added.)

Viewed in light of this testimony and the record as a whole, Woody's "work this hard" statement is capable of an innocent, non-defamatory meaning. So it was not defamation *per se*.

We have considered Amys's contention that *even if* Woody's statement should have been submitted as defamation per quod rather than defamation per se, the error was harmless. This is true, Amys contends, because the jury effectively found the additional elements required in a defamation per quod case—malice, falsity, and damages—through its award of punitive damages. We disagree. As Woody points out, nothing in the jury instructions or verdict form shows the award of punitive damages was based on a finding of falsity.

We also agree with Woody that—*even if* Woody's statement qualified as defamation per se—Amys still had "the burden of proving the element of

publication." *See Huegerich v. IBP, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). And "[a] defamatory communication is not published, and is therefore not actionable, unless it is heard *and understood by a third person to be defamatory*." *Id.* (emphasis added). But Woody argues that Amys did not offer testimony from any witnesses who heard the precise statement ("work this hard") on which the court instructed. And so, Woody contends, Amys failed "to offer evidence the statement (or even a substantially similar statement) was heard *and understood to be defamatory*." (Emphasis added.) We agree with Woody. Amys does not identify— and we did not find—evidence that supported these requirements.

For all of these reasons, we conclude the district court erred in denying JNOV on the claim of defamation per se. We reverse and remand for dismissal of this claim.

### B.    Woody's "no ethics" comment

We turn next to Woody's statement to Kelly Brown that Amys "has no ethics." Springboard and Amys claimed this statement was defamatory. But the district court concluded the statement was not actionable because it amounted to constitutionally-protected opinion—not a statement of objective fact. We agree with the district court.[3]

The First Amendment to the United States Constitution provides Americans with broad freedom of speech. This freedom limits the power of courts to punish speakers, even when their words are defamatory. One of those limits "is that '[o]pinion is absolutely protected under the First Amendment.'" *Andrew*, 960

---

[3] This was a summary judgment ruling. Our review is for errors at law. *Andrew v. Hamilton Cty. Pub. Hosp.*, 960 N.W.2d 481, 488 (Iowa 2021).

N.W.2d at 489 (alteration in original) (citation omitted).  So if Woody's statement to Brown was an opinion rather than a statement of fact, it was probably "not actionable."  *See id.*  One caveat, though: Statements *couched* as "opinions" can still be actionable "if they imply a provabl[y] false fact, or rely upon stated facts that are provably false."  *Id.* at 491 (alteration in original) (citation omitted).

It is often hard to say whether a statement should be classified as protected opinion.  *See id.* at 489.  In any event, it is a question "for the court," not a jury.  *Id.*; *see also id.* at 488 ("[S]ummary judgment 'is afforded a unique role in defamation cases.  Judges have a responsibility to determine whether allowing a case to go to a jury would . . . endanger first amendment freedoms.'" (alterations in original) (citation omitted)).  Iowa courts answer this question by considering four factors.  *Id.* at 492.

1. "The first relevant factor is whether the alleged defamatory statement 'has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous.'"  *Id.* (citation omitted).

2. "The second factor is related to the first, focusing on 'the degree to which the [alleged defamatory] statements are . . . objectively capable of proof or disproof.'"  *Id.* (alterations in original) (citation omitted).  "The statement is likely one of fact if it is 'precise and easy to verify.'"  *Id.* (citation omitted).

3. "The third relevant factor is the context in which the alleged defamatory statement occurs," sometimes called the "literary context."  *Id.* at 492–93 (citation omitted).

4.  "The last relevant factor is 'the broader social context into which the [alleged defamatory] statement fits.'"  *Id.* at 493 (alteration in original) (citation omitted).

We start with the first factor—the precision and specificity of the statement. Amys claims Woody's "no ethics" statement is, essentially, an allegation that she is "unethical."  And the word "unethical"—Amys claims—"has a core meaning and is universally defined."  As support, Amys cites various dictionaries.

We disagree.  For one thing, we are not sure whether having "no ethics" is quite the same as being "unethical."  Assuming they are the same, the dictionaries cited by Amys show that "unethical" has many possible meanings and shades of meaning.  Amys's brief lists all of these possibilities: (1) "wrong and unacceptable according to rules . . . about morality"; (2) "wrong and unacceptable according to . . . beliefs about morality"; (3) "morally wrong"; (4) "against accepted standards of behavior, especially in a particular profession"; (5) "lacking moral principles"; (6) "unwilling to adhere to proper rules of conduct"; (7) "not morally acceptable"; (8) "unethical business practices"; (9) "not conforming to a high standard"; (10) "not ethical"; (11) "illegal and unethical business practices"; (12) "immoral and unethical behavior." (Citations omitted.)  Note, too, that some of these options are themselves ambiguous.  For instance, "wrong and unacceptable according to . . . beliefs about morality" could mean any number of things depending on one's "beliefs about morality."[4]  So we do not think Amys has shown a precise, specific factual content within Woody's "no ethics" comment.

---

[4] We do not imply an endorsement of metaethical or normative moral relativism. We simply recognize that, "[a]s a matter of empirical fact, there are deep and

We turn next to the second factor—whether the statement is subject to proof or disproof. Our analysis here necessarily overlaps with our discussion of the first factor. Because Amys has shown no precise, specific factual content for Woody's statement, she has also failed to show how we would prove or disprove the (undetermined) factual content of Woody's statement.[5] As the district court rightly noted, "It is a different situation than asserting that someone broke the law or engaged in a particular act that could be proven or disproven."[6]

Next we consider the third factor—the context in which the statement occurs. Amys observes that Woody made the "no ethics" statement "to a high level media executive with ultimate authority over both Woody's and Amys's advertising rates and spots." This certainly explains why Amys could be concerned about Woody's obviously-negative statement. Even so, these contextual details bring us no closer to finding "precise and verifiable" facts within Woody's statement.[7] *See*

---

widespread moral disagreements across different societies" and, indeed, within our own society. *Moral Relativism*, Stanford Encyclopedia of Philosophy (revised Mar. 10, 2021), https://plato.stanford.edu/entries/moral-relativism/#DesMorRel (defining "*Descriptive* Moral Relativism" (emphasis added)).

[5] We recognize Amys's witnesses testified that she is ethical. Still we face the problem of specificity. What specific facts—if any—did those witnesses convey by describing Amys as "ethical"? And were *those* specific facts—if any—the same or different from the specific facts—if any—conveyed through Woody's "no ethics" statement? We cannot say—in part because we cannot say what specific facts (if any) were conveyed by the "no ethics" statement.

[6] At oral argument, Amys and Springboard's counsel suggested Woody was implying Amys was a thief and a liar. Their brief mentions this as well, but only in a passing reference. It notes: "Stating that a person has no ethics is no different than calling that person a liar, a cheater, or untrustworthy." But Amys and Springboard have cited no authority for this interpretation of the phrase "no ethics." And, for reasons already explained, we are unable to say that Woody's phrase "no ethics" carries this specific factual content.

[7] We have considered Amys and Springboard's suggestion that Woody's "no ethics" comment was, essentially, a repetition of his prior verbal statements that Amys was violating their separation agreement. Thus, Amys and Springboard

*Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 773 (Iowa 2006) (noting "'substandard and poor performers' do not have a precise and verifiable meaning and are therefore less likely to give rise to clear factual implications").

The fourth factor—the social context—adds little to our analysis. Amys argues that "Woody's statements to Brown are particularly defamatory in this context because he was competing with Amys for advertising spots and rates and not stating matters of public concern." All the same, we still struggle to say Woody's "no ethics" statement conveyed *specific facts* and not just calumnious *opinion*.

All things considered, we conclude Woody's "no ethics" statement fell within the First Amendment's protection for opinions. The district court was right to conclude the statement was not actionable.

## C.    Springboard and Amys's proposed amendment

Finally, we address Springboard and Amys's contention that the district court should have permitted an amendment to their pleadings. We can reverse "only upon a showing of a clear abuse of discretion." *In re Estate of Workman*, 903 N.W.2d 170, 175 (Iowa 2017).

Springboard and Amys's proposed amendment would have added additional claims of defamation. But the district court concluded those new claims

---

argue, the "no ethics" comment conveyed specific factual content, namely, that Amys's violated their separation agreement. We note, however, that the jury was expressly asked whether Woody defamed Amys "by making the statement that Amys was violating the separation agreement." The jury answered "no." So if we were to equate Woody's "no ethics" comment with Woody's statements that "Amys was violating the separation agreement," we would likely conclude Woody's "no ethics" comment did not defame Amys. In any event, we would find no basis for reversal.

would have failed as a matter of law because they were based upon statements of protected opinion. So the court denied the amendment as futile.

On appeal, Springboard and Amys argue the amendment should have been granted because it was timely[8] and would not have substantially changed the issues. But even when an amendment is timely, and even when it would not change the issues, the district court may still refuse the amendment if it would be futile. *See Bailiff v. Adams Cnty. Conf. Bd.*, 650 N.W.2d 621, 626 (Iowa 2002) (concluding the district court correctly denied motion to amend where proposed additional claims failed as a matter of law). Springboard and Amys have not demonstrated that their additional claims would have been viable and—therefore—the amendment would not have been futile. So they have shown no abuse of discretion.

### III. Conclusion

Capital and Woody were entitled to JNOV as to Springboard and Amys's claim of defamation per se. We reverse and remand for entry of an order dismissing that claim. As to all other issues, we affirm.

**REVERSED AND REMANDED ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

---

[8] Woody vehemently denies the amendment was timely. It was proposed well after pleadings were closed and just days before trial. For reasons explained, we need not decide the timeliness issue.